Juanita C. MARTINEZ et al., Plaintiffs,

v.

DIXIE CARRIERS, INC., et al., Defendants-Appellees,

v.

E. I. DuPONT de NEMOURS & COMPANY, INC., Defendant-Appellant-Cross Appellee,

v.

WILSCO, INC., Defendant-Appellee-Cross Appellant.

No. 74–3311.

United States Court of Appeals, Fifth Circuit.

March 29, 1976.

Alfred L. Deaton, III, Michael Wood, Frank E. Caton, Houston, Tex., for E. I. DuPont de Nemours & Co.

Howell E. Stone, Alice Giessel, Dudley Oldham, Houston, Tex., for Wilsco, Inc.

Jon Montague, Houston, Tex., for Dixie Carriers.

V. W. McLeod, Galveston, Tex., for E. W. Saybolt & Co.

Benton Musslewhite, Houston, Tex., for J. C. Martinez.

Before GOLDBERG and AINSWORTH, Circuit Judges, and NICHOLS,[*] Associate Judge.

AINSWORTH, Circuit Judge:

 This multiparty suit in admiralty grows out of the death of a shore-based worker performing services in Texas City, Texas, on a barge used to transport benzene and similar cargoes. On March 1, 1972,[1] Joseph Martinez was overcome by noxious fumes while he was engaged in stripping a barge (the B–29) liquid free. The B–29 had been used to transport Hytrol-D, a petrochemical mixture containing a substantial concentration of benzene. Juanita C. Martinez, as the surviving widow and as the personal representative of the surviving children and her husband's estate, filed this suit to recover damages for the alleged wrongful death of her husband. Named as defendants were Dixie Carriers, Inc., the owner and operator of the barge at the time in question; Wilsco, Inc., the barge stripping company and employer of Martinez; E. I. DuPont de Nemours & Company, Inc., the manufacturer of Hytrol-D; and other parties that have since been dropped from the suit. The suit against Wilsco was abandoned later in view of the employer's immunity from tort liability under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905. Plaintiffs' action against Dixie Carriers was based on negligence and the alleged unseaworthiness of the barge; that against DuPont was predicated on negligence and strict products liability. DuPont cross-claimed for indemnity and contribution against Wilsco, claiming that the cleaning methods used by Wilsco were grossly negligent, and against Dixie Carriers for negligence in its selection of the stripping contractor. Wilsco counterclaimed against DuPont seeking contribution and/or indemnity, and Dixie cross-claimed against the other two defendants, asserting that any unseaworthiness of the barge was caused by DuPont's dangerous or defective chemical product and the manufacturer's negligence in failing to warn of the product's inherent dangers, or by Wilsco's negligence in conducting the stripping operation.

Without admitting liability, Wilsco, Dixie and DuPont stipulated that plaintiffs were entitled to recover $335,000 pending the court's resolution of liability, indemnity and contribution issues. Defendants paid this amount to the plaintiffs in final settlement of their claims in accordance with the percentages of liability determined by the District Court, subject to the condition that appropriate adjustments would be made if the apportionment of damages was changed on

---

[*] Of the U. S. Court of Claims, sitting by designation.

1. Because the accident involved in this case occurred prior to the enactment of the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 86 Stat. 1251, Pub.L. No. 92–576 (Oct. 27, 1972), codified in scattered sections of 33 U.S.C. §§ 901 et seq., the Amendments are not applicable to this case. See Cooper Stevedoring Co., Inc. v. Fritz Kopke, Inc., 417 U.S. 106, 107 n. 1, 94 S.Ct. 2174, 2175 n. 1, 40 L.Ed.2d 694, 698 n. 1 (1974); Johnson v. Warrior & Gulf Navigation Co., 5 Cir., 1975, 516 F.2d 73, 74 n. 1.

appeal. Plaintiffs took no part in the trial, and Wilsco assumed Dixie's defense, pursuant to a hold-harmless agreement with Dixie Carriers entered into shortly before trial.

Before the B–29 arrived at the point where it was to be stripped, the Wilsco employees were advised that it contained a residue of dripolene, the generic name in the industry for a common industrial substance that DuPont marketed under the trade name "Hytrol-D." No efforts were made after the barge arrived to check for documents carrying detailed product warnings. Tests performed shortly thereafter indicated deficient oxygen content and 100 per cent explosibility in the atmospheres of the barge's various tanks. A second oxygen test taken prior to entry into any of the tanks indicated that the oxygen level had increased substantially. However, contrary to industry practice and applicable safety regulations, no tests for the toxicity of the tanks' atmospheres were performed.[2] The stripping operation proceeded by inserting the hose from a vacuum truck into one of the barge's tanks and sucking the liquid residue out of the barge. When most of the liquid had been withdrawn in this way, Wilsco crewmen were sent down into the tank to squeegee remaining puddles into a corner from which they could be removed by the vacuum truck. As the work progressed, the atmospheres of successive tanks were not retested immediately prior to entry, again contrary to applicable safety regulations.

Shortly after entering the fifth tank to be stripped, Martinez returned topside to put on the only respiratory equipment available. When his foreman, who had followed him into the tank, noticed the appearance of noxious fumes, he ordered evacuation of the tank, but Martinez collapsed before he could make his escape. Due to the absence of adequate respiratory apparatus and other protective gear, repeated efforts to enter the tank and rescue Martinez were of no avail.

The Medical Examiner who performed the autopsy on Martinez found that his death resulted from acute benzene intoxication and noted that traces of similar toxic compounds which might also have contributed to his death were present.

The District Court found that the negligence of Wilsco was the proximate cause of Martinez' death, that Dixie was not negligent, that the warranty of seaworthiness did not extend to Martinez, that DuPont was liable for failing to warn of the true nature of its product, and that such failure to warn also constituted a proximate cause of Martinez' death. In its final judgment, the Court concluded that Wilsco should bear 75 per cent of the damages and that DuPont should bear the remaining 25 per cent. Our review of the facts and controlling legal principles of this case convinces us that the District Court erred in concluding that Martinez was not entitled to the warranty of seaworthiness, and in holding that DuPont had breached its duty to warn Wilsco and Wilsco's employees of the nature of its product. It follows that DuPont must be compensated by Wilsco for the portion of damages it originally paid.

## I. The Duty to Warn

DuPont's liability in the proceedings below was predicated on two conclusions of law by the District Court: (1) DuPont was negligent in failing to warn of the identity, nature and dangerous propensities of Hytrol-D, and of the proper precautions necessary for the safe handling thereof; and (2) as a manufacturer, DuPont was strictly liable for injuries proximately caused by its failure to furnish adequate warnings concerning the dangerous propensities of its chemical product. In order to evaluate these conclusions properly, it is necessary to elaborate the factual setting surrounding DuPont's alleged breach of its duty to warn in these two closely related areas.

DuPont's primary customer for Hytrol-D is Industrial Solvents Corporation,

---

**2.** *See* 29 C.F.R. §§ 1915.11(b), 1915.14(a), (d) (1975).

a petrochemical broker. While DuPont uses the trade name Hytrol-D or aromatic distillate to identify its product to its customers, Industrial Solvents and Dixie Carriers tend to refer to it as dripolene. On the occasion in question, Industrial notified Dixie that a cargo was to be loaded on February 26, 1972, at DuPont's Sabine River facility, and then barged to the Mobil Oil Corporation refinery at Beaumont, Texas, where it was to be off-loaded. Title to the product passed to Industrial when the product left the DuPont pipeline and entered the B–29.

The trial judge found that the B–29 was equipped with large permanent signs on the main deck with the words, "Warning, Dangerous Cargo, No Visitors, No Smoking, No Open Lights." He also found that at the time of loading, DuPont placed a Benzene Warning and Cargo Information Card promulgated by the Manufacturing Chemists Association on the barge. This warning card displayed two red skull and crossbones insignias, indicated that only properly protected and authorized personnel should be used to effect cargo transfer, detailed a variety of hazards including the harmfulness of the chemical's vapors, and provided instructions for handling various possible accident or emergency situations. The benzene warning card was selected because specific Coast Guard instructions required that Hytrol-D be classified and regulated as benzene while in marine transit. DuPont maintains that in addition to these two warnings, one of its employees placed a product identification card in the barge's "tube"—a special compartment on the barge which was the normal repository of such documents and was designed to keep them out of the weather. This card identified the cargo of the B–29 as "aromatic distillate," and carried the following warning:

MODERATELY TOXIC ON SHORT EXPOSURE TO HIGH CONCENTRATIONS. SEVERELY TOXIC ON REPEATED EXPOSURE. AFFECTS BLOOD PROPERTIES. CAN BE ABSORBED BY SKIN AND CAUSES IRRITATION TO SKIN. WASH IT OFF WITH COPIOUS QUANTITIES OF WATER & SOAP & GET MEDICAL HELP. HANDLE AS A FLAMMABLE TOXIC MATERIAL.

The card also indicated that when it became necessary to make or break lines containing the substance, or while sampling, "acid gloves and coverall goggles are the minimum protective equipment necessary." DuPont's normal procedure in handling Hytrol-D shipments was to prepare a bill of lading upon completion of loading and to attach a product identification card to the copies of the bill of lading accompanying the shipment. One set of these papers was placed in the barge's tube and another given to the captain of the towing vessel. The DuPont employee responsible for putting these documents on the B–29 testified that he had prepared the bill of lading covering the shipment, but he lacked independent recollection of attaching the product identification card and placing these documents on the barge. Although there was nothing to indicate that he had not followed normal procedures in this regard,[3] the District Court indicated in its findings of fact that it was "unable to determine from the evidence whether or not a copy of this document [the cargo identification card] was actually aboard the B–29 on the occasion in question." The District Court then went on to find that

[a]t no time did DuPont convey any warnings or any information sufficient to apprise of . . . [the] inherent dangers, properties and capacities of

3. A marine surveyor and consulting engineer hired by Dixie Carriers to conduct a survey of the B–29 on the day following the accident indicated that he had not noticed any instrument or document identifying Hytrol-D as the commodity being transported and giving specific warnings of its hazards or instructions for safe handling. He also acknowledged, however, that he had not checked the barge's tube.

its product. The MCA benzene card previously described did not contain information adequate for this purpose. However, the information on the cargo identification card contained adequate information if same had been properly and promptly displayed to its customers and to third parties who could or would be in a position to be using this product. Insofar as Dixie, Wilsco and the Wilsco employees, including Joe Martinez, were concerned, DuPont failed adequately to identify the true nature of its product, either by content, trade name, or otherwise.

The District Court thus found that the warning on the product identification card would have been adequate if the card had been "properly and promptly displayed." The burden of proving that DuPont had failed to comply with its duty to warn in this manner was on the parties claiming breach of duty. *See, e. g., Stief v. J. A. Sexauer Manufacturing Co.*, 2 Cir., 1967, 380 F.2d 453, 459, *cert. denied*, 389 U.S. 897, 88 S.Ct. 220, 19 L.Ed.2d 216 (1967); *Vandercook and Son, Inc. v. Thorpe*, 5 Cir., 1963, 322 F.2d 638, 644; *Thomas v. Gillette Co.*, La.App., 1970, 230 So.2d 870, *writ refused*, 255 La. 809, 233 So.2d 249 (1970); 1 L. Frumer & M. Friedman, Products Liability, § 8.01 at 151 (1975) (by implication); *cf. Watz v. Zapata Off-shore Co.*, 5 Cir., 1970, 431 F.2d 100, 119; *see also* W. Prosser, Handbook of the Law of Torts, § 103 at 671–72 (4th ed. 1971). Since the Court determined that the only evidence submitted in this regard (*i. e.*, that concerning the presence or absence of the identification card on the barge) was inconclusive, Wilsco and Dixie failed to meet their burden of proof on this issue, and accordingly, it was error to hold that DuPont had not discharged its duty to warn.

Moving beyond the factual issues relating to the nature of the warnings actually given, there are a number of other factual matters which have a bearing on the existence and scope of the duty to warn in this case. First, Hytrol-D is a petrochemical intermediate which Du-Pont marketed only to other industrial users who utilized it in the manufacture of gasoline. In no sense did DuPont's intended marketing scheme contemplate that Hytrol-D be sold to or used by the general consuming public. Second, although Hytrol-D is a mixture of a number of hydrocarbon byproducts of Du-Pont's ethylene production process, benzene is its major toxic constituent and compliance with normal safety procedures for the safe handling of benzene provides adequate safeguards from the hazardous propensities of Hytrol-D. While benzene is a highly toxic and dangerous chemical, it is a familiar product with wide ranging uses in the petrochemical industry, and its dangers are generally appreciated in the maritime trades. Third, as would be expected, given the limited marketing scheme and the widespread awareness of the hazards of handling this type of product, the workers dealing with the B–29's cargo were experienced professionals. Although Wilsco had only limited experience in stripping barge tanks at the time of the Martinez accident, Wilsco and the supervisor of the B–29 job both had extensive experience in cleaning shoreside tanks. The supervisor had also been involved in cleaning ships, and on different occasions had worked specifically in cleaning benzene and dripolene from shoreside tanks. Martinez himself was a professional with at least eight years of experience with Wilsco in shore tank cleaning. Finally, Wilsco's foreman on the B–29 job testified that he was told a week before the job began that the barge contained dripolene (Hytrol-D), and the job supervisor's testimony indicated that if anything, it was Wilsco's policy to take greater precautions with dripolene than with benzene.

### A. Liability for Negligent Failure to Warn

■ As indicated above, the first ground for the District Court's conclusion that DuPont was partially liable for Martinez' injuries was its conclusion that DuPont was negligent in failing to warn

of the identity, nature and dangerous propensities of Hytrol-D. As our review of the facts has indicated, however, Wilsco and its employees were aware of the nature of the liquid residue being stripped from the B–29 and knew of the dangers associated with handling a product such as Hytrol-D. In fact, they were experienced professionals in the field of stripping and cleaning tanks which had contained benzene, dripolene, and similar petrochemical substances, and it was for this reason that they had been hired to strip the B–29.

The great weight of authority supports the proposition that in an action for negligent failure to warn, there is no right to recover where the party to be warned is already aware of the danger. *See, e. g., Kritser v. Beech Aircraft Corp.*, 5 Cir., 1973, 479 F.2d 1089, 1096 (dictum); *Thibodaux v. McWane Cast Iron Pipe Co.*, 5 Cir., 1967, 381 F.2d 491 (manufacturer relieved of duty to warn of corrosion dangers of cast iron pipe used in gas lines where knowledge of such dangers was within scope of expertise of consulting engineers who designed municipal gas system); *Hobart v. Sohio Petroleum Co.*, 5 Cir., 1967, 376 F.2d 1011, *aff'g* N.D.Miss., 1966, 255 F.Supp. 972 (manufacturer not liable for deaths of minors overcome by fumes in tank of a crude oil barge discharging its cargo because there was no duty to warn where crude oil in shipment was no more dangerous than ordinary crude); *Jamieson v. Woodward & Lothrop*, 1957, 101 U.S.App.D.C. 32, 247 F.2d 23 (*en banc*), *cert. denied*, 355 U.S. 855, 78 S.Ct. 84, 2 L.Ed.2d 63 (1957); Marschall, *An Obvious Wrong Does Not Make a Right: Manufacturers' Liability for Patently Dangerous Products*, 48 N.Y.U.L.Rev. 1065, 1078 (1973) (no duty to warn of danger obvious to individual harmed); Note, *The Manufacturer's Duty to Warn of Dangers Involved in Use of a Product*, 1967 Wash.L.Q. 206, 213 (same). In *Littlehale v. E. I. DuPont de Nemours &*

*Co.*, 2 Cir., 1967, 380 F.2d 274, the Second Circuit affirmed a summary judgment in favor of DuPont in an action involving a civilian employee of the Navy and an apprentice fireman who were injured by the premature explosion of an explosive device which utilized a DuPont detonator. The action was predicated on negligent failure to warn. Relying upon the fact that the blasting caps in question were specifically manufactured for Army Ordinance, which thoroughly trained its members to be expert in the use of explosives, the court held that failure to provide any warnings except those specified by I.C.C. regulations[4] did not constitute negligence. *Accord, Croteau v. Borden Co.*, 3 Cir., 1968, 395 F.2d 771, *aff'g* E.D.Pa., 1968, 277 F.Supp. 945; *Stief v. J. A. Sexauer Manufacturing Co.*, 2 Cir., 1967, 380 F.2d 453; *cf. Helene Curtis Industries, Inc. v. Pruitt*, 5 Cir., 1967, 385 F.2d 841, *cert. denied*, 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968).

The principle established by these and other cases with respect to liability for negligent failure to warn is correctly enunciated in Section 388 of the *Restatement (Second) of Torts*:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) *has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition,* and

---

4. *Cf.* DuPont's compliance in the instant case with Coast Guard regulations under which Hytrol-D was classified with benzene and appropriate warnings were required.

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Restatement (Second) of Torts* § 388 (emphasis added). Comment *k* to this provision adds that warning of a product's defects is unnecessary where the supplier of the product has "reason to believe that those who will use it will have such special experience as will enable them to perceive the danger . . . ."

In view of the limited marketing of Hytrol-D to industrial users, DuPont could reasonably anticipate that only professionals familiar with the precautions necessary for safe handling of benzene and similar petrochemical substances would come in contact with or otherwise handle the cargo of the B–29. The Wilsco stripping crew was in fact composed of such professionals, and the crew had been made aware of the nature of the liquid residue to be stripped from the barge. At least with regard to individuals having such expertise, the warnings provided by DuPont in the form of the benzene warning card and the product identification card should have been adequate to apprise crew members of the hazards of entering the barge's tanks. Accordingly, we conclude that the District Court erred to the extent that it imposed liability on DuPont on the basis of negligent failure to warn.

### B. Strict Liability

■ For reasons that parallel those advanced in the previous section, the District Court's holding that DuPont should be strictly liable for placing in commerce an inherently dangerous chemical product without furnishing adequate warnings is also in error. According to the influential section 402A of the *Restatement (Second) of Torts,*

One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

As the *Restatement* comment concerning the phrase "unreasonably dangerous" indicates,

[m]any products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption . . . . That is not what is meant by "unreasonably dangerous" in this Section. *The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.*

*Restatement (Second) of Torts* § 402A, Comment *i* (emphasis added). Strict products liability thus does not mean that a seller is an insurer for all harm resulting from the use of his product, but merely that the seller is liable to an injured user or consumer if his product is unreasonably dangerous, however careful he was in producing it. *See Borel v. Fibreboard Paper Products Corp.*, 5 Cir., 1973, 493 F.2d 1076, 1087, *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 127 (1974). However, lack of an adequate warning in itself renders a product defective or unreasonably dangerous within the meaning of products liability law. *See Alman Bros. Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc.*, 5th Cir., 1971, 437 F.2d 1295, 1303; *Davis v. Wyeth Laboratories*, 9 Cir., 1968, 399 F.2d 121, 126–27, 128–30. The question whether DuPont was strictly liable for Martinez' death hinges on whether Hytrol-D was defective and unreasonably dangerous in this limited sense.

■ The adequacy of DuPont's warnings in this regard cannot be evaluated apart from the knowledge and expertise of those who may reasonably be expected to use or otherwise come in contact

with the product as it proceeds along its intended marketing chain. In *Helene Curtis Industries, Inc. v. Pruitt*, 5 Cir., 1967, 385 F.2d 841, *cert. denied*, 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968), for example, we held that a consumer who suffered severe chemical burns from application of a mixture of products designed to bleach hair was not entitled to recover from the manufacturer on the basis of strict liability in tort, since the product was marketed solely to professional beauticians, and the evidence indicated that a professional would have taken precautions in addition to those prescribed by the product directions which would have prevented the consumer's injuries. Aside from the directions, the only warning on the Helene bleach stated "FOR PROFESSIONAL USE ONLY—NOT FOR PUBLIC SALE." 385 F.2d at 857. As we stated in *Helene Curtis*, the product manufacturers

> were justified in anticipating . . . professional methods, since it is well settled that a manufacturer has the right to expect that his product will be used in the normal and customary fashion. *McCready v. United Iron & Steel Co.*, 10th Cir. 1959, 272 F.2d 700; *Bennett v. Pilot Products Co.*, 120 Utah 474, 235 P.2d 525 (1951). When these products were marketed, the makers could only foresee that they would be applied by a trained beautician. Therefore, the directions had to be adequate only for the professional's use. *Taylor v. Jacobson*, 336 Mass. 709, 147 N.E.2d 770, 775, 76 A.L.R.2d 1 (1958).

385 F.2d at 858. In light of the limited marketing of Hytrol-D to industrial users, DuPont, like *Helene Curtis*, was entitled to rely on the professional expertise of those who could reasonably be expected to come in contact with its product, and to tailor its warnings accordingly.

A similar result was reached in *Jacobson v. Colorado Fuel & Iron Corp.*, 9 Cir., 1969, 409 F.2d 1263. In that case, the foreman of a crew involved in the manufacture of prestressed concrete was killed by the snapping of a cable in a high-pressure tightening device. The court held that the manufacturer of the cable could not be held strictly liable for the foreman's death, since the decedent's employer should have known and actually did know the dangers inherent in the use of the cable in the tightening device. The manufacturer had no duty to warn the purchaser of its cables of dangers already known by the purchaser and its supervising personnel. *See also Hopkins v. E. I. DuPont de Nemours & Co.*, 3 Cir., 1954, 212 F.2d 623 (dynamite manufacturer not liable for failing to warn of danger of premature explosion if dynamite placed in newly drilled hole before allowing heat caused by drilling to escape, where blasting foreman knew of the danger).

■ Wilsco contends that our decision in *Borel v. Fibreboard Paper Products Corp.*, 5 Cir., 1973, 493 F.2d 1076, *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 127 (1974), is controlling on the issue of strict liability in this case. In *Borel*, manufacturers of insulation products were held strictly liable to an insulation worker who developed asbestosis and mesothelioma and ultimately died because of their failure to warn of the dangers of inhaling asbestos dust. Our holding in that case, however, was predicated on our conclusion that the dangers of inhaling asbestos dust were not sufficiently obvious to insulation workers to relieve manufacturers of the duty to warn. *See* 493 F.2d at 1093. The relation of asbestos dust inhalation to asbestosis and mesothelioma was well documented in medical journals during most if not all of the period of Borel's exposure, but Borel, an insulation worker since 1936, was understandably unaware of these technical medical findings. *See id.* at 1081–86. In contrast to the situation in *Borel*, knowledge of hazards associated with Hytrol-D was well within the scope of the Wilsco crew's professional expertise; crew members knew of the dangers associated with entry into tanks which had carried dripolene and its constituents, and they had actual knowledge

of the nature of the B-29's cargo. Under these circumstances, it would be inappropriate to hold DuPont strictly liable for failure to warn. *See Restatement (Second) of Torts* § 402A, Comment *n*. Other arguably applicable cases allowing strict liability recoveries against manufacturers, *e. g., Jackson v. Coast Paint and Lacquer Co.*, 9 Cir., 1974, 499 F.2d 809, are similarly distinguishable on the ground that the injured party was not sufficiently aware of the dangers which resulted in harm to relieve the manufacturer of liability for failure to warn.

As would be expected of those experienced in the stripping and tank cleaning trade, the Wilsco crew was conversant with the hazards and the precautions necessary for the safe handling of a chemical mixture with a high benzene content such as Hytrol-D. At least for the limited class of professionals to which the Wilsco employees belonged, the warnings on the benzene card provided by DuPont—to say nothing of those on the product identification card which, in the absence of persuasive proof to the contrary, must be assumed to have been given—should have been adequate for purposes of informing the Wilsco crew of the dangers associated with stripping the residue from the B–29. Since the warnings were adequate for this limited class, the product was not unreasonably dangerous as to them, and accordingly it was error for the District Court to hold that a member of that class may recover from DuPont on the basis of strict liability.

## II. The Warranty of Seaworthiness

Because the District Court concluded that the warranty of seaworthiness did not extend to Martinez, no formal findings with respect to the seaworthiness of the barge were entered. During the trial, however, the Court indicated that the vessel was unseaworthy because of the negligent manner in which the stripping operation was conducted and because of the failure to provide adequate warning of the hazardous nature of the cargo. In view of our disposition of the warning issue, it should be apparent that we do not regard DuPont's alleged failure to warn as a source of the barge's unseaworthiness. Nonetheless, it is evident that the barge was unseaworthy. The findings that were entered indicate that Wilsco was negligent in failing to provide Martinez with proper equipment and in failing to take proper steps to assure that the atmosphere within the B-29's tanks was safe for human life. If appropriate equipment had been available, the stripping could have been performed from the barge's deck, without sending men into the tanks. The only respirator equipment available was a single mask covering nose and mouth, which was plainly inadequate in view of its failure to protect Martinez from the fumes he encountered. Moreover, the absence of additional respiratory equipment and other suitable lifesaving devices precluded timely rescue efforts. While oxygen and explosibility tests had been conducted, atmospheres were not retested immediately prior to tank entry, and no efforts had been made to test tank atmospheres for toxicity, all of which was contrary to normal industrial practice and applicable safety regulations.[5]

The use of defective or inadequate equipment or gear not reasonably suited for the purposes for which it is used may render a vessel unseaworthy. *See, e. g., Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499, 91 S.Ct. 514, 517–18, 27 L.Ed.2d 562, 567 (1971); *Law v. Sea Drilling Corp.*, 5 Cir., 1975, 510 F.2d 242, 248; *Grigsby v. Coastal Marine Service of Texas, Inc.*, 5 Cir., 1969, 412 F.2d 1011, 1031–32, *cert. denied*, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970). Moreover, it is well settled that an improper method of handling cargo can create an unseaworthy condition. *See Morales v. City of Galveston*, 370 U.S. 165, 170, 82 S.Ct. 1226, 1230, 8 L.Ed.2d 412, 416 (1962); *Miller v. Royal Nether-*

5. See 29 C.F.R. §§ 1915.11(b)(1) and 1915.14(a), (d) (1975).

*lands Steamship Co.,* 5 Cir., 1975, 508 F.2d 1103, 1107 (dictum); *Baker v. S/S Cristobal,* 5 Cir., 1974, 488 F.2d 331; *Marshall v. Ove Skou Rederi A/S,* 5 Cir., 1967, 378 F.2d 193, 196 & n. 3. A number of cases have indicated that where the "improper method" involves violation of statutory safety regulations,[6] there is unseaworthiness as a matter of law. *See Carey v. Lykes Brothers Steamship Co., Inc.,* 5 Cir., 1972, 455 F.2d 1192, 1194 n. 2; *Manning v. M/V "Sea Road",* 5 Cir., 1969, 417 F.2d 603, 611 (negligent violation of safety regulations simultaneously makes vessel unseaworthy). Our decision in *Grigsby, supra,* is particularly pertinent. In that case, a land-based patrol guard was fatally injured when he rushed to the aid of an employee of an independent contractor (also shore-based) who had been overcome by an undetermined noxious gas while attempting to pump out the wing tank of a barge. We held that failure on the part of the contractor to test or ventilate the tank or to equip its workers with needed safety appliances made the vessel unseaworthy, and further, that the patrol guard was entitled to recover for this breach of the seaworthiness warranty. 412 F.2d at 1018, 1029–33.

Since unseaworthiness is a species of liability without fault, *Seas Shipping Co., Inc. v. Sieracki,* 328 U.S. 85, 94, 66 S.Ct. 872, 877, 90 L.Ed. 1099, 1105 (1946), a shipowner is liable under the warranty of seaworthiness even though the unseaworthy condition was created by the independent contractor whose employee is injured.[7] *See Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc.,* 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958); *Alaska Steamship Co. v. Petterson,* 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954); *James v. Sea-Land Service, Inc.,* 5 Cir., 1972, 456 F.2d 221. The circumstances in the present case thus support the conclusion that the B–29 was unseaworthy.

Having so concluded, we are next confronted with the question whether the warranty of seaworthiness extended to Martinez. Over the past thirty years, the class of claimants permitted to recover under the warranty of seaworthiness has been broadened to embrace not only seamen, the original beneficiaries of the warranty, *see* The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903), but also a broad but not unlimited class of shore-based workers. *Sieracki, supra,* the case which initiated the trend toward broadened shoreward access to the seaworthiness remedy, indicated that the right to recover on this basis should be limited to shore-based workers "doing a seaman's work and incurring a seaman's hazards." 328 U.S. at 99, 66 S.Ct. at 880, 90 L.Ed. at 1109. This test was refined in *West v. United States,* 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959), which limited recovery for unseaworthiness to those performing "ship's work" in connection with a vessel in navigation. The Court in *West* emphasized that

> the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work

---

6. Other regulations violated by Wilsco, in addition to those cited in note 4, *supra,* include 29 C.F.R. §§ 1915.12(a)(3), 1915.82(a)(6), 1915.-82(b)(2), and 1915.11(b)(2) (1975).

7. The "operating negligence" exception to this rule, articulated in *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 500, 91 S.Ct. 514, 518, 27 L.Ed.2d 562, 567 (1971), is not applicable in the present case. In *Usner,* the Supreme Court held that the warranty of unseaworthiness does not extend to situations where a longshoreman's injuries are caused by the isolated, personal negligent act of a fellow longshoreman and not by the condition of the ship, her appurtenances, her cargo or her crew. There, a longshoreman was struck and injured when a winch-operator (a fellow employee) lowered a sling from a boom too rapidly. In contrast, Martinez' death occurred because of the unavailability of proper apparatus and because appropriate safety procedures were not followed. Martinez' death was thus occasioned by a hazardous condition which existed throughout the period of the stripping operation up to the time of the accident, and not by an isolated negligent act of a co-worker. *See Carey v. Lykes Brothers Steamship Co., Inc.,* 5 Cir., 1972, 455 F.2d 1192, 1194–95 (distinguishing *Usner* on similar grounds).

contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury.

361 U.S. at 122, 80 S.Ct. at 192, 4 L.Ed.2d at 165. Elaborating on *West* and subsequent case law in *Waganer v. Sea-Land Service, Inc.*, 5 Cir., 1973, 486 F.2d 955, we stated that this limitation on the breadth of the class of those entitled to unseaworthiness recovery

> may be roughly equated with the following requirements: (i) the ship in question must have been in navigational status, and not "dead", which in turn depends upon whether the contracted work is minor or major, and who has custody and control of the ship while the work is being done; and (ii) the pattern of repair must reflect work traditionally and ordinarily done by seamen, excluding persons performing such tasks as making major repairs requiring drydocking or special skills.

486 F.2d at 958. Since there is no question that the B–29 was "in navigation" in the requisite sense, *see Waganer, supra*, at 958; *Delome v. Union Barge Line Co.*, 5 Cir., 1971, 444 F.2d 225, 232, *cert. denied*, 404 U.S. 995, 92 S.Ct. 534, 30 L.Ed.2d 547 (1972); *Drake v. E. I. Du-Pont de Nemours & Co.*, 5 Cir., 1970, 432 F.2d 276, 277, our inquiry here is limited to the question whether the task performed by Martinez comes within the ambit of "work traditionally done by seamen."

▬▬▬▬ With regard to this question, the District Court entered the following finding of fact:

> There is no evidence that the work of "Stripping" a barge liquid free, which was the job being undertaken the Wilsco employees on the occasion in question, was a task traditionally performed by seamen.

In reviewing this finding, we are bound by the clearly erroneous standard of Fed. R.Civ.P. 52(a), and may overturn it only if we are left with the definite and firm conviction that this finding is mistaken.

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129, 148 (1969); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 765 (1948). However, undisputed evidence in the record indicated that the B–29 carried a waste tank which was designed to be used for stripping products out of the barge, and that the previous owner's boat crews had used this waste tank for stripping purposes while the barge was in transit between unloading and new loading destinations. We therefore hold that the District Court's finding that there was no evidence that stripping was a task traditionally performed by seamen was clearly erroneous. Moreover, as will appear in what follows, the District Court's view of what constitutes the traditional work of a seaman was too narrow. Since its factual and legal conclusions in this regard reflect the application of an improper legal standard, these conclusions are not insulated by the "clearly erroneous" standard. *LeBlanc v. Two-R Drilling Co.*, 5 Cir., 1976, 527 F.2d 1316; *Shultz v. First Victoria National Bank*, 5 Cir., 1969, 420 F.2d 648, 654 & n. 10; *Manning v. M/V "Sea Road"*, 5 Cir., 1969, 417 F.2d 603, 607. *See also United States v. Singer Manufacturing Co.*, 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823, 838 (1963).

In support of its argument that Martinez was not performing the traditional task of a seaman at the time of his death, Wilsco contends that there is a difference between "cleaning" and "stripping" a barge, and that the process of stripping the barge's tanks to its waste tank should not be confused with the final process of stripping the barge, including the waste tank, since the latter requires specialized shore-side equipment and personnel. While we recognize that there are technical differences between these processes, the differences are not great enough to distinguish the type of activity that Martinez was engaged in at the time of his death from traditional "ship's work" and more particularly,

from actual work previously performed by seamen on the B–29. Regardless whether "stripping" here is analogized to cases involving cleaning, loading or unloading, or minor maintenance work necessary for normal handling of cargo, it is a process that fits easily within established categories of traditional seaman's work.

There can be little question that cleaning constitutes "ship's work" in the required sense, as Wilsco's effort to distinguish "stripping" from "cleaning" impliedly suggests. A particularly telling case in this regard is *Torres v. The Kastor*, 2 Cir., 1955, 227 F.2d 664. Torres was injured in the course of cleaning a vessel from the effects of transporting a cargo of loose pitch in order to make it ready again for general cargo. The Second Circuit correctly held that Torres was entitled to a warranty of seaworthiness.

▆ Similarly, it has been clear since the Supreme Court's decision in *Sieracki, supra*, that those engaged in loading or unloading cargo are engaged in the traditional work of seamen.[8] Wilsco contends that DuPont's effort to portray stripping as part of the unloading process is "farfetched" since undisputed facts indicated that the barge's cargo had already been unloaded at a Mobil Oil plant in Beaumont, Texas. We cannot agree. Equally undisputed facts indicate that residual fluid remained at the bottom of the B–29 when the barge left the Mobil plant, and that the stripping was necessary to prepare the barge for its next cargo. The stripping operation must thus be viewed either as the final step in the off-loading process, or as the initial step in a subsequent loading process. In either case, stripping can be viewed as an integral part of the loading or unloading process, and the warranty of seaworthiness should properly have been ex-

tended to one such as Martinez who was engaged in that activity. *See Gebhard v. S. S. Hawaiian Legislator*, 9 Cir., 1970, 425 F.2d 1303, 1311. *See also James v. Sea-Land Service, Inc.*, 5 Cir., 1972, 456 F.2d 221 (1972) (longshoreman loading pallets in deep tank of a ship, who was overcome by carbon monoxide fumes from a fork lift, allowed recovery under warranty of seaworthiness).

The case law regarding minor maintenance operations also supports the conclusion that an individual injured in the course of stripping a vessel is entitled to recover under the seaworthiness warranty. As we emphasized in *Waganer v. Sea-Land Service, Inc.*, 5 Cir., 1973, 486 F.2d 955, 959,

> *West* requires that the focus of inquiry be upon the pattern of repairs, rather than the specific type of work being done by each shore-based seaman at the time of injury. . . . [T]he issue to be resolved is whether the work being done by . . . [the land-based workers] as a group is that ordinarily done by seamen.

In *Waganer*, the court held that it was error to deny the prima facie applicability of the warranty of seaworthiness and to enter summary judgment against the plaintiff, where the plaintiff had been injured while performing welding that the shipowner's own seamen would not undertake but which was arguably a type of repair work which seamen ordinarily do. 486 F.2d at 959–60. Similarly, the Supreme Court in *The M/V "Tungus" v. Skovgaard*, 358 U.S. 588, 595 n. 9, 79 S.Ct. 503, 508 n. 9, 3 L.Ed.2d 524, 529 (1959), held that a shore-based pump-repairman was protected by the warranty of seaworthiness. Skovgaard was called onto the Tungus when a pump being used to unload coconut oil broke down. Considerable spillage of oil had occurred when the pump became de-

---

8. Because of limitations on the shoreward reach of maritime tort jurisdiction, the unseaworthiness remedy is not available for injuries which occur on shore during the loading or unloading process and which are not caused by a vessel on navigable water. *Victory Carri-*

*ers, Inc. v. Law*, 404 U.S. 202, 207–15, 92 S.Ct. 418, 422–27, 30 L.Ed.2d 383, 388–93 (1971). However, since Martinez was injured while on board the barge, this limitation on the scope of the seaworthiness remedy is inapplicable here.

fective, creating an unseaworthy condition on the deck. After walking through some of the spilled oil, Skovgaard slipped and fell to his death in eight feet of hot coconut oil. Still another case, *Rogers v. United States*, 5 Cir., 1972, 452 F.2d 1149, involved injuries suffered by a repairman while installing sea chest piping. Installation of the sea chest had required dry-docking the ship involved and cutting an 18″ x 21″ hole in its hull below waterline. In that case, we held that installation of the sea chest and the associated fittings and additions was the type of work traditionally performed by seamen, and that Rogers was thus within the purview of the warranty of seaworthiness. 452 F.2d at 1153. *See also Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953) (carpenter employed by refitting company which was engaged by vessel to make repairs to loading machinery held to be a *Sieracki* seaman); *Shaver Transportation Co. v. Chamberlain*, 9 Cir., 1968, 399 F.2d 893 (expert in repair of diesel engines frequently sent aboard vessels to take care of mechanical trouble that was beyond the competence of ships' crews engaged in traditional seamen's work); *Read v. United States*, 3 Cir., 1953, 201 F.2d 758 (carpenter employed by independent contractor making renovations in ship entitled to warranty of seaworthiness).

In the present case, the physical configuration of the barge and the history of in-transit stripping indicate that Martinez was engaged in a type of work which might ordinarily have been performed by seamen. The B–29 was equipped with a built-in suction system which is designed to strip the residue out of cargo tanks into a waste tank which is fifteen feet long, five feet wide, and four feet tall. Although Martinez was utilizing a shore-side source of suction (a vacuum truck), he was engaged in precisely the type of cargo tank stripping that a seaman could ordinarily perform. If a patrol guard attempting to rescue someone overcome by gas in a barge's wing tank has *Sieracki* seaman status

because he was acting as "a maritime life salvor" and "[h]is impulsive action [was] in the best tradition of the sea," *Grigsby, supra,* at 1022, then Martinez' activity, which comports much more closely with an ordinary seaman's task, is also entitled to seaworthiness protection.

A final argument raised by Wilsco with regard to the unseaworthiness issue is that Martinez' work cannot be considered the traditional work of a seaman because it demanded specialized equipment, notably the vacuum truck, and special expertise in dealing with the dangerous chemical cargo. While there are cases which deny *Sieracki* seaman status on this ground, *see, e. g., United N. Y. & N. J. Sandy Hook Pilot's Ass'n v. Halecki*, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959); *Delome v. Union Barge Line Co.*, 5 Cir., 1971, 444 F.2d 225, *cert. denied*, 404 U.S. 995, 92 S.Ct. 534, 30 L.Ed.2d 547 (1972); *Drake v. E. I. DuPont de Nemours & Co.*, 5 Cir., 1970, 432 F.2d 276, this is not such a case. In *Halecki*, the Court noted that the work done by the injured individual

> was in no way "the type of work" traditionally done by the ship's crew. It was work that could not even be performed upon a ship ready for sea, but only when the ship was "dead" with its generators dismantled. Moreover, it was the work of a specialist, requiring special skill and special equipment—portable blowers, air hoses, gas masks, and tanks of carbon tetrachloride, all brought aboard the vessel for this special purpose, and none connected with a ship's seagoing operations. Indeed, the work was so specialized that the repair yard engaged to overhaul the vessel was not itself equipped to perform it, but had to enlist the services of a subcontractor. A measure of how foreign was the decedent's work to that ordinarily performed by the ship's crew is that it could be performed only at a time when all the members of the crew were off the ship.

358 U.S. at 617–18, 79 S.Ct. at 519, 3 L.Ed.2d at 544. As in *Halecki*, the degree of specialization in *Delome* and *Drake* was also significantly greater than that involved in the present case. The minor structural repairs undertaken in *Delome* "were not such as could have been performed in the ordinary course of business in the shipping industry." 444 F.2d at 232. They necessitated dry-docking the vessel, and cutting a large heavy plate out of the forward rake and inserting a new one, which required the use of specialized equipment not normally categorized as appurtenant to a vessel. The project involved in *Drake* required that cargo tanks be inspected for cracks by magnaflux and x-ray tests, and the type of welding required to mend the cracks was so highly specialized that Drake was one of the only two welders (out of numerous welders who worked at the shipyard where Drake was employed) qualified to do the work. It was established that the job in question called for a certified welder, and that certified welders were not available at sea. 432 F.2d at 278. In our view, the stripping operation in which Martinez was engaged was not comparable to the activities in these cases, and the cases cited earlier concerning cleaning, loading and minor maintenance work are controlling. Accordingly, we conclude that Martinez was covered by the warranty of seaworthiness.

### III. Conclusion

■ Our disposition of the warning and unseaworthiness issues makes it unnecessary for us to consider other issues raised by the parties on this appeal. Because DuPont is not liable either in negligence or in strict liability for its purported failure to warn Wilsco and its employees of the dangers of Hytrol-D, the District Court erred in holding DuPont liable for a portion of the damages paid by way of settlement to Martinez' survivors and estate. Since Martinez was entitled to the warranty of seaworthiness, he should have been allowed to recover from Dixie Carriers, which in turn had a right to indemnity from Wilsco, in view of Wilsco's agreement to hold Dixie harmless, and in view of the indemnity doctrine established in *Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), which was prevailing law at the time of Martinez' death. *See also LeBlanc v. Two-R Drilling Co.*, 5 Cir., 1976, 527 F.2d 1316. Thus, 100 per cent of the loss should have been borne by Wilsco, and DuPont should now be able to recover the portion of the loss it was erroneously ordered to bear (25 per cent) from Wilsco.

Reversed.