Mrs. Ivy L. GORDON, Plaintiff-Appellee,

v.

NIAGARA MACHINE & TOOL WORKS, Defendant-Appellant.

No. 76–3675.

United States Court of Appeals, Fifth Circuit.

June 12, 1978.

Rehearing and Rehearing En Banc Denied July 31, 1978.

Allan D. Shackelford, Clarksdale, Miss., for defendant-appellant.

Henry Woods, Little Rock, Ark., Morris Collins Bailey, Batesville, Miss., for plaintiff-appellee.

Before WISDOM, GOLDBERG, and RUBIN, Circuit Judges.

PER CURIAM.

We affirm the judgment below on the basis of Judge Keady's careful and well-reasoned opinion reprinted as an appendix to this opinion.

AFFIRMED.

APPENDIX.

MRS. IVY L. GORDON, Plaintiff

v.

NIAGARA MACHINE AND TOOL WORKS, Defendant

No. DC 72–42–K

United States District Court,
N. D. Mississippi,
Delta Division.

Sept. 9, 1976.

MEMORANDUM OPINION

In this diversity action, plaintiff, Mrs. Ivy L. Gordon, on June 9, 1969, lost four fingers of her left hand when operating a punch power press in the course of her employment by Poloron Corporation (Poloron). The press, which was manufactured by defendant Niagara Machine and Tool Works (Niagara), cycled unexpectedly while being manually operated by plaintiff and while her hand was within the jaws, or shearing area, of the press.

The facts surrounding this injury, as determined at the original trial, are as follows. The press was manufactured by Niagara and in 1954 sold directly to its customer, Poloron, at New Rochelle, New York. Five years later, Poloron moved the machine to its Batesville, Mississippi plant, the site of the accident. The press, equipped with a positive, mechanical, full-revolution clutch, is approximately ten feet tall, weighing 60 tons, and operates at a stroke standard, up and down, of three and a half inches. The press requires two-thirds of a second to cycle, or a full second for a cycle and a half.

The press was a multipurpose type, with an open back inclinable configuration, and adaptable to an almost infinite number of industrial uses calling for cutting, stamping, forming, etc. It was adapted to these various functions through installation of dies appropriate for the particular function, with the usual configuration involving attachment of the "female" portion of the die to the base of the press, and attachment of the "male" portion of the die to the ram of the press. When the press was activated, the overhead ram would cycle through a downward stroke toward the base, producing the desired result on whatever raw material had been placed in the die area, or "pinch point", of the press. The press could be set, by means of a selection button, to cycle continuously with an automatic feed of material at 90 strokes per minute or to "single-stroke" in a manually-fed operation.

The press being a multipurpose type, Niagara sold it "naked", that is, without dies,

and without guards or safety apparatus, although Niagara did manufacture and market a line of safety attachments. In accordance with the custom in the power press industry, the selection of dies and appropriate guarding or safety devices was left to the purchaser. In this instance Poloron, after acquiring the machine, removed the foot treadle which Niagara had installed for manual operation, and replaced it with a two-palm button system made by Schreder Corporation. The palm button system was a method often employed in manual feeding by industrial users, and was well known to Niagara, which itself marketed similar equipment. This system was activated by air pressure and required the use of both hands to operate. This was, to a considerable degree, a safety measure since the press then could not be activated if either hand was inside it. It was, however, well known in the power press industry, long prior to 1954, that two handed tripping devices afforded no protection in case of repeat stroke. 1948 American Standards Association Code for Power Presses (P. Ex. 26).

Niagara was aware that its press was not completely "fail-safe", i. e., that it might cycle without being intentionally activated. Nowhere in its instructions did Niagara state that, even when a two-handed tripping device was used in manual feeding, there remained the hazard of unexpected cycling. The only warning which Niagara furnished at the time of sale was contained within the course of a 31-page service manual (P. Ex. 28) supplied to Poloron with the press; it stated "Never place your hands under the slides or between the die unless the power is off and the slides blocked up." Niagara did not place a label, decal or other sign on the machine warning of danger, nor did it advise its customer of any need to affix such a warning on the machine where it could be seen by press operators. Instead, Niagara left it up to Poloron to instruct its employees as to what was in the service manual.

Mrs. Gordon was never notified or warned by Poloron of danger in placing her hands within the die area when the press was set for manual operation. On the day of her injury, she was operating the press, as instructed, in a single-stroke manually-fed shearing procedure. She was removing a piece of cut material from the pinch point of the press when the machine unexpectedly cycled, amputating her fingers. The unexpected cycling was, in our view, attributable to failure of the press clutch to hold after completion of the normal stroke. In any event, either this condition or some other mechanical failure of the press, and not the act of Mrs. Gordon, caused the press to "double trip" or repeat its stroke.

On the basis of the foregoing facts, this court concluded at the first trial that Niagara was negligent in failing effectively to warn press operators of the dangers of coming in contact with the die areas, and therefore was liable to an operator, ignorant of the hazard, who was injured by an unexpected cycling of the press, whatever the cause of such cycling, absent warning that the press, even when set for manual operation, had such proclivity. Our prior conclusion was grounded on the Restatement (Second) of Torts § 388 (1965):

§ 388. Chattel Known to be Dangerous For Intended Use

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

"(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

"(b) *has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition*, and

"(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." [1] (Emphasis added).

Our judgment in favor of Mrs. Gordon was reversed on appeal, *Gordon v. Niagara Machine & Tool Works*, 506 F.2d 419 (5 Cir. 1974). The Fifth Circuit reversed for lack of evidence to support our finding that clause (b) of § 388 was satisfied, i. e., that Niagara had no reason to believe that Poloron's employees, including plaintiff, would not be informed by Poloron of the danger of bodily contact with the pinch point of the press because of the possibility of double tripping at any time. If, on retrial, we found that Niagara had no reason to expect Poloron to communicate to persons using the machine as press operators warning of such danger, the Court of Appeals further directed that we reexamine the proximate cause issue in light of Poloron's duty under Mississippi law to warn inexperienced employees of dangers of which they are ignorant and to enforce rules to render dangerous work as safe as reasonably possible.

Upon retrial additional evidence was submitted to the court on the questions remanded for our decision. For the following reasons, after mature consideration, we determine on the basis of the whole record and the additional evidence submitted that our prior conclusion of liability was correct, and we adhere thereto.

## FAILURE TO WARN

The Fifth Circuit accepted our original finding that the plaintiff had no reason whatever to believe that the Niagara power press, when set on single stroke, would cycle unless activated by the palm-press button and therefore she had no reason to think that it was dangerous to place her hands in the die area when manually feeding materials into the press in the customary manner. From the information in the service manual furnished with the press, however, the Court of Appeals was of the view that it "could be inferred that Niagara had reason to expect that from warnings by the employer [Poloron] the ultimate user [Mrs. Gordon] would discover the danger of double tripping." We thus address the question of whether Niagara could have expected Poloron to warn its press operators of the danger of unanticipated cycling of the press. It becomes important to examine closely what sort of warning Poloron received from Niagara. It read: "Never place your hands under the slides or between the die *unless the power is off and the slides blocked up.*" (Emphasis added).

At the first trial, Niagara's sales manager noted this caution was located "in the section just behind the maintenance part of it [the service manual], where you get to the adjustments," and not elsewhere (Tr. 391–392).

At retrial plaintiff introduced highly credible expert testimony that in typical industrial plant practice, a service manual of the sort supplied by Niagara generally can be expected to be routed to plant maintenance or mechanical engineering personnel who retain it for their reference, and that service manuals ordinarily are not passed on to persons employed as punch press operators. In fact, instruction in the operation of a power press in many plants typically consists of no more than a foreman's demonstration to the operator of how the press operates, and seldom, if ever, does the average press operator acquire, or is expected to acquire, the skill needed to work on the machine or make adjustments to correct malfunctioning. The manual did not unequivocally advise an operator of danger of serious bodily injury in feeding the press by hand. Plaintiff's industrial experts testified that Niagara's warning in its lengthy service manual was, by its terms, directed to maintenance personnel— it refers to "blocking up" the slides "when

---

1. Mississippi expressly approved this statement of tort liability in *Robirtson v. Gulf & S. I. R. Co.*, 171 Miss. 628, 158 So. 350 (1935).

the power is cut off," an operation ordinarily performed only by trained service personnel in changing dies, making adjustments or otherwise performing maintenance service. This terminology had a readily understood meaning in the power press industry.[2] As we view the evidence, it would be highly improbable that the average press operator would know how to perform such tasks or that a press manufacturer would expect such persons to undertake work of that nature or know of the perils associated with it. We further find that Niagara had no reason to believe that its customer, Poloron, from the limited information furnished in its service manual, would regard it necessary to warn the punch operators, as well as its skilled service personnel, that the press had an inherent capability for double tripping.

Moreover, were Niagara's service manual furnished to the average operator, it is reasonable to conclude that because of the technical nature of the instructional material, the average operator would most probably fail to perceive any hazard in using the machine for manual operation, absent known malfunctioning which would require adjustment or service by expert personnel. We therefore believe that Niagara should have known that the character of the warning in its instruction manual was designed for service personnel, and unlikely to be effectively or understandingly communicated to persons like the plaintiff who were employed only to operate the press. Perhaps the most persuasive evidence in this regard appears in Niagara's revision of its machine manual (D. Ex. 19), which was made at some date after 1954 but no later than 1959. On the front page of this service manual is a prominent warning *in red letters*, as follows:

This decal which Niagara instructed not to remove from the machine emphasized the *dangers of serious bodily injury to any operator without proper instruction and without first reading and understanding the machine manual.* The court finds as a fact (see colloquy with court, Tr. 393–396, 397) that Niagara did not furnish Poloron the above decal, notice or sign, or advise its customer to affix one on the press either in 1954 or at any subsequent time. Garland McCoy, Poloron's maintenance supervisor, who had 20 years experience working with Niagara presses, testified that he maintained the machines "as close to the manufacturer's recommendations as possible." He was, of course, well aware that press operators were required to use their hands to feed material into the press on single stroke, but knew that the two-handed tripping device was used to activate the machine in manual operation. (D. Ex. 20, McCoy deposition, pp. 13, 35, 36–37.)

It is reasonable to infer from the record that since Niagara neither placed a warning on the press nor instructed its customers to do so, Poloron failed to perceive the need for mounting an appropriate danger sign on the machine, and relied, instead, upon a belief that the danger was obviated by having the operator use the two-palm button system.

2. "Injuries at the point of operation occur when the operator or his helper or the die tryout personnel place their hands in the danger zone to load or unload the stock or processed part. Setup and maintenance personnel incur injuries when they work on a press without first shutting off the main power source and blocking up the press slide (ram)." National Safety Council, *Accident Prevention Manual for Industrial Operations*, Chapter 24, Power Press and Forging Operations, p. 24.2 (P. Ex. 27).

In addition to the basic inadequacy of what Niagara inserted in its service manual, it had every reason to believe that a manual of this type could easily be lost or misplaced within a few years after it sold its press. Indeed, Niagara's own practice was to discard its earlier literature after periodic revisions. Niagara, having long experience in manufacturing power presses, in 1954 knew that the useful life of its press could exceed many years, that the presses could be used by a succession of owners and operators and, in the exercise of ordinary care, would know of the likelihood of haphazard practices of its customers in handling and preserving service manuals. Niagara also knew, or in the exercise of care should have known, that hand feeding the material at the point of operation was regarded as the most dangerous of all power press operations, and that from government publications, power press accidents accounted for the second highest number of industrial accidents in the use of any sort of machine, and that such accidents resulted in permanent disability to the operator in over one-half of the cases. U. S. Dept. of Labor (1944 Bulletin 67, Safety Subjects, p. 92) (P. Ex. 33).

On the basis of the foregoing facts, which Niagara knew or should have known in 1954, we find that it had no reason to believe that Poloron would appreciate or fully realize the danger of the press from double tripping, when the machine was designed and manufactured for manual feeding, on a single stroke, and was, we think, maintained in good working order. Poloron was told no more than what should be done if the press required the expert service of trained personnel—in that event maintenance personnel were instructed to "Never place your hands under the slides or between the die unless the power is off and the slides blocked up."

■ We conclude that the unique facts of this case do satisfy the critical requirement of clause (b) of § 388 of Restatement. The Fifth Circuit accepted our original finding that the Niagara press is the type of chattel covered by § 388(a), "one likely to be dangerous for the use for which it is supplied," and it indicated our prior conclusion regarding § 388(c) would be "eminently correct" if we found the requirements of clause (b) to be met. We therefore adhere to our original view that Niagara's failure to physically attach, or cause to be attached, a plate, sign, or other warning device to a machine possessing dangerous characteristics known to it but not to Poloron, was a breach of the duty to exercise reasonable care effectively and adequately to warn ordinary press operators of double tripping and of grave hazards from bodily contact with the die area.

■ In arriving at the above conclusion, we specifically reject the construction of § 388(b) urged by Niagara; namely, that clause (b)—that the supplier "has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition"—should be interpreted as relieving the supplier of the chattel of liability if the supplier had *any* reason to believe that a user might realize its dangerous propensity. This contention is clearly at odds with the comments to § 388, particularly Comment *n*. Although this comment refers to what constitutes reasonable care to warn under clause (c), the Comment would be a meaningless exercise by the Restatement authors if clause (b) had the superficial meaning which Niagara would ascribe to it. Comment *n* explains under what circumstances a supplier should be deemed to have exercised reasonable care to warn a user of a chattel of its dangerous character by warning only the third person through whom the chattel is supplied. A portion of Comment *n* states:

> Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. *The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it.* (Emphasis

added). Restatement (Second) of Torts, § 388, p. 308.

We believe that the foregoing language establishes the proper standard which must be met before a supplier can utilize clause (b) to avoid § 388 liability to a user on the basis of some warning furnished to a third person through whom the chattel is supplied. Stated differently, to escape liability under clause (b), the supplier must have a reasonable belief that the user will learn of the chattel's dangerous condition through such warning as the supplier may have furnished the third person.

To adopt Niagara's interpretation of clause (b) would clearly frustrate the salutary purposes of § 388. Under that view, which we reject, a supplier who furnishes a dangerous chattel through a third party could almost invariably invoke clause (b) to escape liability to a user of the dangerous chattel by the simple expediency of supplying to the third party any sort of caution, regardless of its sufficiency in the light of the relative special knowledge and experience of the supplier, the person to whom the chattel is supplied and the actual users of the chattel. To avoid liability, the supplier must, as a minimum, have a reasonable basis for believing that the third party would understand the full purport of any warning or caution given and could be expected to communicate such warnings to those using the dangerous chattel. This standard is supported by Comment *k* to clause (b) which discusses the scope of warning required when the chattel supplied is one of dangerous character:

> In such case, if the supplier, *having such special experience*, knows that the condition involves danger and has no reason to believe that those *who use it will have such special experience as will enable them to perceive the danger*, he is required to inform them of the *risk of which he himself knows and which he has no reason to suppose that they will realize.* Id., p. 307. (Emphasis added).

Cf. *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 465 (5 Cir. 1976), an admiralty case construing § 388(b).

Niagara's warning in its service manual, couched in language not designed to be understood by press operators and in a manner which Niagara should have known was not likely to be effectively communicated to press operators, does not, in itself, provide a sufficient basis for Niagara reasonably believing that the average press operator would realize the machine's innate danger. There is no evidence, apart from the service manual warning, that in 1954 Poloron knew from its own experience of the capability of the power press to double trip when set on manual feeding, in the absence of known malfunction. Such experience as Poloron subsequently gained in using similar Niagara machines may not erase Niagara's negligent omissions in 1954 when supplying the press to Poloron. Indeed, Niagara may not claim that Poloron, in 1954 or prior thereto, was aware of the inherent proclivity of the press to trip unexpectedly, unless for some reason it became necessary for Poloron's maintenance personnel to change dies or make other adjustments without "the power cut off and the slides blocked up."

Niagara's argument that in 1954 its competitors in the power press industry gave no different warning than Niagara rests solely upon the self-serving statements of its agents, and was not a fact established by disinterested witnesses. Since the court was without evidence of what warnings Niagara's competitors issued to its customers in 1954, we cannot say that Niagara's service manual contained warnings equal or even similar to directions, cautions, or warnings then furnished by other press manufacturers.

## STRICT LIABILITY IN TORT

Plaintiff contends, alternatively, that Niagara should be held subject to strict liability in tort under § 402(a), Restatement (Second) of Torts. Section 402(a) is a firmly settled principle in Mississippi's jurisprudence, and we regard this question, which was not reached in our prior ruling, to remain open on remand. It is first argued by plaintiff that the press, having been sold by the manufacturer without

guarding devices, was, *per se*, in a defective condition unreasonably dangerous for the intended user. Although some jurisdictions appear to accept this contention, *Bexiga v. Havir Mfg. Co.*, 60 N.J. 402, 290 A.2d 281 (1972); *Rhoads v. Service Machine Co.*, 329 F.Supp. 367 (E.D.Ark.1971), we decline to find a multifunctional, general purpose machine, like the Niagara press, was in defective condition when marketed without guarding devices. The machine having been designed for many kinds of operation, it was incumbent upon the machine purchaser to select safety devices appropriate for his particular function. This procedure was the universal custom which prevailed in the industry in 1954, and ever since. Moreover, we are not convinced that any single device known to the power press industry in 1954, such as the mechanical interlock which Dr. Youngdahl described in his testimony, could have been designed to prevent repeat action of a press with a mechanical positive full-revolution clutch and an open back inclinable configuration to allow feeding of material from all four sides. Such a device would have materially curtailed the myriad uses for which Niagara's press was designed, manufactured and marketed. *Ward v. Hobart Mfg. Co.*, 450 F.2d 1176, 1184–85 (5 Cir. 1971), applying Mississippi law. We are mindful, however, that in a proper case, the absence of warning to the user of a dangerous product can trigger § 402(a) liability. "[L]ack of an adequate warning, in itself, renders a product defective or unreasonably dangerous within the meaning of products liability law." *Martinez v. Dixie Carriers*, supra, at 465, citing *Alman Bros. Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc.*, 437 F.2d 1295, 1303 (5 Cir. 1971); *Davis v. Wyeth Laboratories*, 399 F.2d 121, 126–67, 128–30 (9 Cir. 1968). In *Martinez*, the Fifth Circuit held DuPont's warning sufficient to prevent the product from being defective and unreasonably dangerous. Chief Judge Brown ob-

served that "[T]he adequacy of DuPont's warnings . . . cannot be evaluated apart from the knowledge and expertise of those who may reasonably be expected to use or otherwise come in contact with the product as it proceeds along in its intended marketing chain." 529 F.2d at 465–66. Recovery was denied in *Martinez* because in the absence of contrary proof, the warning was deemed adequate to inform the limited class of users, who were trained professionals, as to the dangers associated with the product. In this case, although Niagara's warning was adequate to alert trained service personnel as to the hazards of working on this press, was it sufficient to bring home to press operators generally the great danger of serious bodily injury while feeding the machine manually? An excellent discussion of the problem here presented is contained in *Seibel v. Symons Corp.*, 221 N.W.2d 50 (Supreme Court of North Dakota, 1974). Admittedly, the cases on sufficiency of warning to avoid strict liability in tort are difficult to reconcile, as each decision turns upon the particular facts as to the nature of the product, the kind of warning supplied and the level of expected expertise of the intended user. Since we had held it was a negligent omission under § 388 for Niagara not to affix directly on the machine (or *direct* its customers to do so) explicit warnings *to all operators*, the absence of such label or warning, which could have been inexpensively and easily affixed to the machine or otherwise supplied by Niagara as designer, manufacturer and seller, would logically cast upon Niagara strict liability in tort under Restatement § 402a. The two theories of liability, while conceptually different,[3] for all practical purposes, here merge into a single breach of duty—Niagara's failure to assure that ordinary press operators would be aware of the danger of severe physical injury whenever feeding the machine manually.

---

**3.** *Jackson v. Coast Paint and Lacquer Co.*, 499 F.2d 809, 812 (9 Cir. 1974):

"In strict liability it is of no moment what defendant 'had reason to believe.' Liability arises from 'sell[ing] (sic) any product in a

defective condition unreasonably dangerous to the user or consumer.' It is the unreasonableness of the condition of the product, not of the conduct of the defendant, that creates liability."

## PROXIMATE CAUSE

We address the second concern expressed by the Fifth Circuit in its remand of the case for our further consideration—can Niagara's negligent failure to warn be regarded as a proximate cause of plaintiff's injuries, or was Poloron's failure to warn an intervening cause which absolved Niagara of its own breach of duty?

Since the evidence disclosed that Poloron consistently neglected its absolute duty under Mississippi law to furnish its employees with reasonably safe appliances with which to work, to warn inexperienced employees of dangers of which they were ignorant, and to enforce safety rules, *Holliday v. Fulton Band Mill, Inc.,* 142 F.2d 1006 (5 Cir. 1944); *Dobbins v. Lookout Oil & Refining Co.,* 133 Miss. 248, 97 So. 546 (1923), the Fifth Circuit questioned our finding that Niagara's negligence proximately contributed to Mrs. Gordon's injuries, wondering whether "Poloron's habitual neglect of its nondelegable duty to warn and instruct had not totally swallowed up the original negligence, if any, of Niagara."

We begin with the observation that the above stated common law duties of an employer to his employee occupy a position no different from any other legal duty recognized insofar as it relates to the general principles of intervening and superseding cause as they operate to screen an initially negligent party from liability for the consequences of his negligent conduct. Legal duties imposed upon an employer are for the benefit and protection of the employee; they enlarge the duty one person owes another absent the employer-employee relationship; that is, an employer may be liable for injuries to his employee in situations where he would not be liable to a nonemployee under similar circumstances. It would be quite illogical, we think, for this independent common law duty designed to aid employees to be twisted into an absolute shield from liability for persons who would otherwise be liable to an employee for losses caused by negligent breach of a wholly distinct legal duty. We do not understand that the Court of Appeals mandated such a result as a matter of law, and we refuse to initiate such a harsh rule. Instead, we believe that the relationship between Poloron and Mrs. Gordon is but one of several factors to be weighed in determining whether Poloron's intervening negligent failure to warn had at the time of her injury supplanted Niagara's original negligence.

Should Poloron's negligence, then, be said to be a superseding cause of plaintiff's injuries, thereby relieving Niagara from liability? In *Solomon v. Continental Baking Co.,* 172 Miss. 388, 160 So. 732 (1935), the general principles of superseding cause were succinctly stated:

> Where an act of negligence is a substantial factor in bringing about an injury, it does not cease to be a legal and proximate cause thereof because of the intervention of a subsequent act of negligence of another which contributed to the injury, *if the prior act of negligence is still operating, and the injury inflicted is not different in kind from that which would have resulted from the prior act.* (Emphasis added). 2 Restatement, Torts, §§ 440–442, 447. 160 So. at 733.

§ 447 of the Restatement of Torts, which was carried forward as originally worded into the Second Restatement, sheds further light on the superseding cause question:

> § 447. Negligence of Intervening Acts
> The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if
> (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or
> (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or
> (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

Clauses (a) and (b) of this section are explicitly clear without need of explanation. Comment *c* to clause (c) explains that the word "normal" (referring to the intervening negligence as a normal consequence flowing from a negligently-created situation or condition) "denotes that the court or jury looking at the matter after the event and knowing the situation which existed when the act was done, including the character of the person subjected to the stimulus of the situation, would not regard it as extraordinary that such an act, though negligent, should have been done." Comment *e* to clause (c) explains "extraordinary negligence" as denoting "that men of ordinary experience and reasonable judgment, looking at the matter after the event and taking into account the prevalence of that 'occasional negligence, which is one of the incidents of human life,' would not regard it as extraordinary that the third person's intervening act should have been done in the negligent manner in which it was done. Since the third person's negligent conduct is a product of the actor's negligent conduct, there is good reason for holding him responsible for the effect, even though it be done in a negligent manner, unless the nature or extent of the negligence is altogether unusual."

Determination of the issue of superseding cause ordinarily presents factual questions to be answered by the trier of fact, and not disposed of as a matter of law. Under the test summarized in the *Solomon* case, the questions presented are (1) was Niagara's failure to warn a substantial cause of plaintiff's injury; (2) was Niagara's negligent conduct of a continuing nature; and (3) was plaintiff's injury resulting from Poloron's negligence the same type of injury expected to result from Niagara's negligence? Under the more detailed Restatement § 447 test, clauses (a), (b), and (c), though stated in the disjunctive, present a common question—was Poloron's negligent failure to warn reasonably foreseeable to Niagara?

Question (1), whether Niagara's failure to warn was a substantial cause of Mrs. Gordon's injuries, must be answered in the affirmative since she did not realize the danger of placing her hand within the die area of the press, in part because of Niagara's failure to make effective warning. Both Question (2), as to the continuing nature of Niagara's failure to warn, and Question (3), as to the similarity of Mrs. Gordon's injuries resulting from Poloron's intervening negligence to those resulting from Niagara's initial negligence, clearly call for affirmative answers. As the trier of the facts in this case, we find ample evidence exists to hold Niagara's negligence, though compounded by Poloron's dereliction, was not superseded as a proximate cause.

*Ford Motor Co. v. Matthews*, 291 So.2d 169 (Miss.1974), addressed foreseeability of intervening third-party negligence as it bears upon superseding cause in the context of personal injuries caused to a user by dangerous machinery. Although *Ford Motor Company* was grounded on strict liability in tort, and not negligence, the issue of intervening cause remains the same.

> Almost all of the cases involving the question of intervening cause relate to negligence actions. However, the general rules established by those cases should be applicable to the facts at hand. As stated by Prosser: "Although there have been few decisions, there is every reason' to expect that the same conclusions, in general, will be reached when strict liability is in question." Prosser, Law of Torts, § 102, at 668 (1971). 291 So.2d at 175.

The Supreme Court in *Ford Motor Company* expressly approved the following statement from Prosser, Law of Torts, § 44 at 272:

> "The question is always one of whether he [the party initially liable] is to be relieved of responsibility, and his liability superseded, by the subsequent event. In general, this has been determined by asking whether the intervention of the later cause is a significant part of the risk involved in the defendant's conduct, or is so reasonably connected with it that the

responsibility should not be terminated. It is therefore said that the defendant is to be held liable if, but only if, the intervening cause is foreseeable." 291 So.2d at 176.

Moreover, the Supreme Court in *Ford Motor Company* noted that the ultimate determination of proximate cause is a question of fact as to whether the manufacturer or supplier of a dangerous chattel could have reasonably foreseen the negligence of the third party in determining whether the intervening negligence of such third party is sufficient to relieve the supplier from liability for the consequences of its own negligence. The court further observed that "just as the duty of care increases with the degree of danger, so should the range of foreseeability." 291 So.2d at 177. See *Rhoads v. Service Machine Co.,* 329 F.Supp. 367 (E.D.Ark.1971); *Bexiga v. Havir Mfg. Corp.,* 60 N.J. 402, 290 A.2d 281 (1972); *Balido v. Improved Machinery, Inc.,* 29 Cal. App.3d 633, 105 Cal.Rptr. 890 (1972).

Because the high degree of grave harm apt to befall operators ignorant of the double tripping proclivity of Niagara's press, the substantial number of serious industrial accidents occurring to press operators and known to the power press industry in 1954 and long prior thereto, and since it was not reasonable for Niagara to expect the limited warning discernible only in a technical service manual furnished with the press would be communicated to press operators, we find as a fact that Poloron's failure to issue proper warnings to its press operators was reasonably foreseeable to Niagara.

Also to be considered on the issue of superseding cause is what effect the passage of 15 years from the manufacturer and sale of the press had upon Niagara's negligence since Poloron also had a duty to warn its employees, especially after it discovered the danger through actual experience in operating Niagara presses. We again look to the Second Restatement of Torts, § 452, as follows:

§ 452. Third Person's Failure to Prevent Harm

(1) Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm.

(2) Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause.

Comment *f* offers guidance as to subsection (2) above:

The circumstances may be such that the court will find that all duty and responsibility for the prevention of the harm has passed to the third person. It is apparently impossible to state any comprehensive rule as to when such a decision will be made. Various factors will enter into it. Among them are the degree of danger and the magnitude of the risk of harm, the character and position of the third person who is to take the responsibility, his knowledge of the danger and the likelihood that he will or will not exercise proper care, his relation to the plaintiff or to the defendant, the lapse of time, and perhaps other considerations. The most that can be stated here is that when, by reason of the interplay of such factors, the court finds that *full responsibility* for control of the situation and prevention of the threatened harm has passed to the third person his failure to act is then a superseding cause, which will relieve the original actor of liability. (Emphasis added).

Although some factors might support a finding that Poloron's negligence had superseded that of Niagara at the time of Mrs. Gordon's injuries, viz., lapse of time, Poloron's relation to plaintiff, and Poloron's knowledge of the danger, consideration of cogent factors compels us to reach a different result. Highly significant are the grave dangers of injury from operating a press absent positive, direct warnings for the operator not to come in contact with the danger zone, and the appalling nature of inju-

ries likely to result. Additionally Niagara, by selling the press without guarding of any kind and knowing that it was subject to many uses through manual operation, knew or should have known that industrial users of its presses, like Poloron, might well fail to observe its safety warnings, making such neglect well within the range of foreseeability by Niagara. Stated differently, Niagara in 1954 had reason to know of the significant number of serious industrial accidents befalling press operators in single stroke operations. Because of these considerations, we do not feel it would be just to regard Poloron's negligence in failing to take safety precautions as the sole proximate cause of plaintiff's injury.

Inasmuch as the record fairly establishes that Poloron never instructed or warned plaintiff or its other press operators of the danger of placing their hands within the die area of the press, the Court of Appeals asks the hypothetical question, "If Poloron had given the required warnings, what more could Niagara's inanimate warning plate have accomplished?" Plaintiff's expert on industrial accident prevention signs gave what, to us, is a most reasonable answer. He testified that a direct warning attached to the press and conspicuously displayed at eye level would surely be a more effective warning than oral words of caution taken from Niagara's manual. A prominent warning on the machine itself would be readily understood as necessary for one's safety, regardless of the level of the operator's skill or experience or whatever the task at hand. Thus, even if Poloron had advised its press operators of physical danger, the failure of Niagara to affix explicit warnings on the machine itself is an omission of such substantial and continuing effect as to have a definite causal connection with plaintiff's injuries.

■ Moreover, Poloron's duty as an employer to warn of danger, and Niagara's duty as the supplier of a dangerous chattel to warn should be measured against the same standard of reasonable care. Thus, if Niagara is required by § 388 to attach a warning sign or plate on the press to satisfy its duty of reasonable care to warn, Poloron, to fulfill its corresponding duty, must likewise ensure that such a warning is given to its employees. If this is so, the question posed by the Court of Appeals becomes moot, i. e., if Poloron had given the "required warnings," there would have been a warning plate affixed to the machine. Poloron, of course, did not in any manner warn its press operators of the dangerous characteristics of the press, much less attach a warning plate to the machine. Unless Poloron's duty to warn per se supersedes the chattel supplier's § 388 duty, automatically absolving Niagara of liability for the plaintiff's injuries suffered, at least in substantial part, because of Niagara's negligent omission—a proposition which we cannot accept—established principles of concurring negligence compel us to find that Niagara's negligence proximately contributed to Mrs. Gordon's injuries.

■ In holding Niagara's failure to warn was a proximate cause of plaintiff's injuries, we see no inconsistency with the several decisions of the Mississippi Supreme Court, *Ford Motor Company v. Matthews,* 291 So.2d 169 (Miss.1974); *State Stove Manufacturing Co. v. Hodges,* 189 So.2d 113 (Miss.1966); and *E. I. DuPont de Nemours & Co. v. Ladner,* 221 Miss. 378, 73 So.2d 249 (1954). As noted by the Court of Appeals, these cases were decided in light of their particular facts. We nevertheless believe that, in juxtaposition, those cases support us on the proximate cause issue. In *DuPont,* a feed manufacturer sold cattle feed containing a chemical ingredient manufactured by DuPont after being expressly warned by DuPont that it had discovered the chemical was unsafe. The Supreme Court held that the manufacturer's deliberate action in selling the feed after receiving the warning was a superseding cause of the resultant death of cattle, relieving DuPont of liability for its original negligence. Certainly, the act of the feed manufacturer, in consciously disregarding the only kind of warning possible for DuPont to make, was an extraordinary act wholly beyond the range of foreseeability. This accords with

the well settled rule that intentionally tortious conduct of a third party becomes the superseding cause. Section 448, Restatement (Second) of Torts, p. 480.

In *State Stove,* the Mississippi Supreme Court found there was *no evidence* that the water heater, which exploded after installation, was in a defective condition at the time it left the manufacturer, and that the contractor's negligent failure to install the water heater as directed by the manufacturer was the *sole* proximate cause of the explosion. In *Ford Motor Co.,* liability against Ford resulted from the manufacturer's installation of a defective starter switch on a tractor which allowed the tractor to start in gear. The owner was killed when the tractor started in gear, dragging a disc over him. It was contended that the negligence of Ford's dealer in failing to replace the switch after express notification from Ford Motor Company that the switch might be defective was the superseding cause of the accident. The court rejected this argument by viewing the dealer's negligence as a secondary, but not sole, cause of the accident. The court distinguished *State Stove* in the following manner:

> Admittedly, the failure of the contractor to install the safety device in *State Stove* was comparable to the failure of Ray Brothers to remedy the defect in the safety switch system, but in *State Stove* this negligent omission was found to be the *only* cause of the accident. In the case at bar, while Ray Brothers' negligence was a secondary cause of the accident, it was not the only cause. The case at bar necessarily involves a weighing of *two contributory causes,* whereas no such question was involved in *State Stove.* 291 So.2d at 176. (Emphasis added).

This case is unlike *State Stove* where only one actor breached a legal duty; rather, as in *Ford Motor Company,* two contributory causes, resulting from breach of separate duties independently owed by two parties, are involved. Neither is wilful third-party neglect, wholly unforeseeable, as existed in *DuPont* present here. Consistent with our understanding of the Mississippi cases, we conclude Niagara's negligent failure to warn was a proximate cause of the accident.

For the foregoing reasons, we issue an order reinstating our prior judgment in this cause.

This, 8th day of September, 1976.

(s) <u>William C. Keady</u>
    Chief Judge
    United States District Court