227 So.2d 601 (1969)
Allen L. DUCOTE et al., Plaintiffs-Appellees,
v.
CHEVRON CHEMICAL COMPANY, Defendant-Appellant.
No. 2822.
Court of Appeal of Louisiana, Third Circuit.
October 30, 1969.
*602 Provosty, Sadler & Scott, by Richard B. Wilkins, Jr., Alexandria, for defendant-appellant.
Laborde & St. Romain, by Jude St. Romain, Marksville, for plaintiffs-appellees.
Before TATE, FRUGE and MILLER, JJ.
MILLER, Judge.
Plaintiffs, Allen J. Ducote, Hampton Bernard, Francis Smith, and Ludo J. Mayeux, Avoyelles Parish farmers, are suing to recover for damages to their respective 1967 cotton crops. The loss was allegedly caused by plaintiffs' use of "Paraquat", a herbicide manufactured by defendant, Chevron Chemical Company. The trial court awarded plaintiff Hampton Bernard, $210.00; Allen Ducote, $462.00; Francis Smith, $800.00; and Ludo Mayeux, $735.00 and defendant appealed.
Defendant urges that the evidence shows plaintiffs had not applied "Paraquat" properly in that they applied it to the cotton before it had matured. Plaintiffs' principal argument is that defendant warranted its product to have certain limited effects on a cotton crop when in fact it could have serious and detrimental effects and in this case, disastrous effects, about which there was no adequate warning.
During the summer of 1967, plaintiffs were invited to attend a meeting sponsored by Paul Wall Farm Service Center of Mansura, Louisiana, and the Ortho Division of Chevron Oil Company, defendant. These meetings are common in farming communities and are used by retailers and manufacturers to acquaint and educate prospective customers with the newest developments for improving their crops. At this meeting, plaintiffs were introduced to Ortho's newest herbicide, Paraquat. They were told that this product could be used as a defoliant when mixed in the proportion of ½ pint to the acre with 10 gallons of water, this mixture to be applied simultaneously with the prescribed application of any other defoliant, when the cotton bolls were 60% to 70% open and the remaining bolls to be harvested were mature. Paraquat's advantages were represented to be the hastening of the defoliating process, forcing the unopened bolls to open more rapidly to facilitate the picking of the cotton and also to control or kill weeds and undergrowth after the leaves have fallen.
Paraquat in liquid form is retailed in one gallon plastic containers. A label on the container contains the name of the product, directions for use, warnings, etc. In most instances, plaintiffs did not want or need a whole gallon and Mr. Wall, or his employee, measured out the amount desired by the customer and put it in an unlabeled container.
The plaintiffs mixed the Paraquat along with the defoliant they customarily used and according to the recommended directions. Plaintiffs testified they applied the Paraquat at the proper stage of the crop, namely when the bolls were 60% to 70% open and the remaining bolls were mature. Within two days after the application of *603 Paraquat along with the regular defoliant the cotton plants shrivelled up, lost their leaves within five days, and the stalks dried up. All the bolls that were unopened when applied turned black and failed to open. The retailer, Mr. Paul Wall and others, including the defendant's sales manager, came to see the crops. According to witnesses, the stalks looked as though they had been killed by a freeze.
In a well written opinion the trial judge offered the following reasoning:
"The defense is that the application in all these cases, was premature. Further, there is a statement in the directions for use, which says: `Immature bolls may be burned and development inhibited.' Further, the beginning paragraph of directions said: `Cotton: Desiccation (some defoliation may occur)' * * * `Immature bolls may be burned and development inhibited.'
"All the plaintiff-farmers intended its use as a defoliant; none intended it as a desiccant. The word `Desiccant' was not defined; nor was the word desiccation defined, except as above quoted. They had been told it would cause defoliation, which was what they wanted; they had been told that it could be mixed with their regular defoliant; that it would cause a quicker defoliation, quicker maturity of the bolls and fluff out the bolls upon opening. They had not bargained for a killer, either from the instructions given or the labels upon the containers."
"According to the evidence defendant conducted experimentation from Alexandria on north to Shreveport in the use of this chemical; it was found satisfactory, they testified. However, the Court gathered there was not too much experimentation in the area of the State south of Alexandria, nor in its effects when combined with other defoliants. And here it is to be noted, the directions make no difference or distinction in the mixture recommended when the chemical is used alone or when mixed with other defoliants. And the Court honestly believes that since the regular defoliant is a herbicide and Paraquat is also a herbicide, admittedly, then the combination of the two, though applied as directed, turned the application as a double dose, with killing effects on the cotton rather than defoliation."
"The Court holds that selling this product by defendant with the representations made and the directions attached, constituted a breach of a duty it had to would be users. The word desiccant is not used in ordinary farmers' language. As defined in parenthesis, immediately after the word, it could cause some defoliation."
"The preponderance of the evidence, in the Court's mind, is that plaintiffs applied the chemical timely * * * when 60% to 70% of the bolls were opened; that it was applied according to directions and by experienced farmers. It was applied and with tragic results * * *."
The directions for the use of Paraquat are of primary importance in determining whether or not the defendant warned prospective customers of the risks in using its product. These directions read as follows:
DIRECTIONS
COTTON: Desiccation (some defoliation may occur)1 to 2 pts. per acre. When foliage is dense, use 2 applications of 1 pint if necessary. Apply when 80% to 95% of the bolls are open and the remaining bolls to be harvested are mature. Immature bolls may be burned and development inhibited. Do not pasture lactating dairy animals. Do not pasture livestock in treated fields sooner than 15 days after treatment. Remove livestock from Paraquat treated area at least 30 days before slaughter. Do not feed gin trash to livestock. *604 Defoliation(some desiccation may occur) ½ pt. per acre in combination with 1 pint (0.75 lbs. active) of phosphate defoliant or 1 gal. (2.0 lbs. active) of chlorate defoliant per acre. Apply when 60 to 70% or more of the bolls are open and the remaining bolls to be harvested are mature. Immature bolls may be burned and development inhibited. When combined with phosphate defoliants, observe livestock cautions listed under the directions for Desiccation. When combined with chlorate defoliants, do not pasture cattle or other livestock on treated areas or feed treated foliage or gin trash.

Aerial ApplicationApply 3 to 10 gals. spray mix per acre. In California and Arizona use the higher gallonage. Do not apply during periods of thermal inversion to avoid drift.

Ground ApplicationApply 10 to 30 gals. spray mix per acre. Arrange nozzles to provide thorough coverage of the foliage. Use a non-ionic surfactant at 1 pt. per 100 gals. spray mix. Do not apply Paraquat to cotton within 3 days before harvest. Repeat application if necessary. Do not make more than 2 applications or exceed a total of 2 pints ORTHO Dula Paraquat per acre.
Defendant introduced a one page advertisement promoting Paraquat and under the caption "Why use Paraquat" the last reason is particularly impressive: To-wit:
7. ORTHO PARAQUAT takes the guess-work out of defoliation.
This Court finds that the directions and in particular the terms desiccant and defoliant are not properly explained on the label so as to afford potential customers some basis for assessing the dangers in using the product. The term desiccant is not a common term and was not shown to be familiar to these farmers. In the defoliant direction the only warning is that "some desiccation may occur" and "immature bolls may be burned and development inhibited". This warning is couched in terms of some possibility of inhibited development but certainly does not adequately warn against the very situation which occurred here, namely, the destruction of the plant and the cotton bolls.
The main thrust of the defense is that plaintiff failed to apply the Paraquat when the bolls were 60% to 70% open and the remaining bolls to be harvested were mature. Defendant stresses the fact that the plaintiffs did not use a proper method of determining the maturity of the cotton. Defendant states that the "knife test" is the proper method of determining maturity. If the knife cuts the boll easily then the boll is immature; and if the knife fails to cut the boll or has great difficulty in doing so, the boll is mature. This procedure defendant states should be accomplished by crisscrossing the field making numerous such tests. Plaintiffs were experienced farmers and arrived at their conclusions relative to the maturity of the cotton based upon their examination of the field as a whole which is the method they normally employed. The directions on the label prescribe no test for determining maturity of cotton. It would appear that if a proper test is so crucial then such a method for testing should be described on the label itself.
The Court is most impressed with the fact that the exhibits introduced by defendant, not only did not warn of the dangers inherent in the use of this product but in fact attempted to minimize any ill effects. In this regard the Court is particularly persuaded by the statement that Paraquat takes the "guess-work" out of defoliation. Certainly a phrase of this nature is intended to lull the prospective customer into a sense of security, and in this case apparently false security, relative to the use of the product.
When the plaintiffs purchased the Paraquat they thought they could use it to remove the leaves from the stalks thus accelerating the time for picking the cotton.
*605 They also thought they could control the grass and thereby facilitate the picking. Unfortunately the Paraquat killed the cotton along with the grass.
The potential risks in the use of Paraquat are graphically illustrated by the testimony by defendant's expert witness Mr. James P. Tanner who, upon questioning by the Court, testified as follows:
"BY THE COURT:
Mr. Tanner, would it be fair to say that regardless of when you apply that on your bolls that are immature it will kill them?
A. Yes Sir.
Q. So whether its 75 percent mature or 90 percent open; or 95 percent open, whenever you apply this, the immature bolls will be stunned and stopped?
A. Yes, Sir.
Q. It kills them and dries them up?
A. That's true.
Q. And it's a question of the farmer then taking a calculated risk. * * * I'll do this now and I'll lose a certain amount but by this quick deal I'll get the maximum I can get, that's correct?
A. Yes, Sir."
Defendants stoutly urge that the manufacturer does not warrant the result from the use of the chemical or the effect thereof on crops. The strongest warning defendant uses in his literature is that there "may" be an inhibited development of immature bolls. It is true that if one searches the label carefully the small print does state that the manufacturer does not warrant the results of the chemicals but this so-called warning pales by comparison to the capitalized outline which stresses how economical Paraquat is, how quickly it readies cotton for harvest, how it controls weeds to make the harvesting clean and more efficient, and finally that it takes the "guess-work" out of defoliation.
Defendant relies on the case of California Chemical Company v. Lovett, 204 So.2d 633 (La.App. 3rd Cir. 1967). The facts of the Lovett case were different. Lovett involved a suit on an open account brought by the seller of chemicals against the buyer, a dusting service. The buyer denied liability on the grounds that the chemicals were useless for the purpose for which they were intended, namely, the killing of boll weevils and bollworms. The Court held that where the chemical company specified in a consignment agreement between the parties that its warranty of the chemicals was restricted to a guarantee only as to the analysis printed on the labels and that it did not warrant the merchandise as being effective for the control and eradication of cotton boll weevils and bollworms the defendant was still responsible for the payment of these chemicals in spite of the fact they did not produce the desired results. The Court emphasized the voluntary consignment agreement between the parties. The Court found that the exclusion or disclaimer of warranty in the consignment agreement was specific, precise, and unambiguous. There was no such specific agreement by the parties in this case and any limited warranty was far outweighed by the special advertisements extolling the virtues of Paraquat.
The sophistication of modern advertising techniques may well cause the courts to take a look at the manufacturer's attempt to avoid liability by fine print warranty limitations appearing in an obscure place on product labels; while the consumer is romanced with Madison Avenue warranties ranging from such guarantees as taking the guess-work out of heretofore vexing problems to providing one with instant status or prestige. The exhibits of advertising materials introduced in this case, when taken as a whole, demonstrate to this Court that the farmers here were not only not warned about the potential dangers but were in fact led to believe *606 that this particular product would produce the desired results with little or no risk.
The Trial Court found that selling of this product by defendant with the representations made and the directions attached constituted a breach of duty to these farmers and we find no error in his judgment.
The judgment of the Trial Court is affirmed. Costs are taxed to defendant-appellant.
Affirmed.