334 So.2d 249 (1976)
Ginger M. Madden, wife of, and Kenneth MADDEN
v.
LOUISIANA POWER AND LIGHT CO., INC. and Gregory-Salisbury Metal Company, Inc.
No. 7366.
Court of Appeal of Louisiana, Fourth Circuit.
June 9, 1976.
Rehearing Denied June 30, 1976.
*251 Monroe & Lemann, Eugene G. Taggart, New Orleans, for La. Power & Light Co., defendant-appellee.
Cronvich & Wambsgans, A. W. Wambsgans and Richard M. Michalczyk, Metairie, for Gregory-Salisbury Metal Co., Inc., defendants-appellants.
Before LEMMON, MORIAL and BEER, JJ.
LEMMON, Judge.
This suit for damages is based upon an accident which occurred when a concrete cover of a utility vault, located in the sidewalk in front of plaintiff's apartment, collapsed and caused plaintiff's foot to fall through into the vault below. The jury *252 found that Gregory Salisbury Metal Products, Inc. (GS), who manufactured the vault and cover, was liable for the accident and that Louisiana Power & Light Company (LP&L), who purchased, installed and maintained the vault and cover, was not. GS paid the judgment and appealed from the dismissal of its demand against LP&L for contribution.

I
GS manufactured the concrete utility box and cover under a franchise from the patentee, Quickset Vault Sales Corporation, and began selling the product to LP&L in 1970. The cover was designed for installation in sidewalks and was represented to withstand pedestrian and light vehicular traffic and to have a useful life of 20 to 30 years.
LP&L installed this particular vault in January, 1972, prior to the construction of the sidewalk in the subdivision. The foreman of the installation crew testified that the box and cover appeared then to be in good condition. Plaintiff moved into the building in April, 1972, and although she and her husband walked near or over the cover daily, they never noticed any crack or other defect. The testimony of three neighbors was to the same effect. Furthermore, LP&L never received any complaints about the cover.
On May 21, 1972 LP&L servicemen removed the cover in order to perform repairs, placed their hand tools on the bottom of the turned-over cover, and then replaced the cover. All four servicemen testified that they did not notice any cracks or defects.
On July 7, 1972, as plaintiff walked on the sidewalk and stepped on the cover, the cover collapsed. She had seen the cover as she was walking, but had not observed any defects.
An LP&L serviceman replaced the cover after normal working hours and placed the old cover in his truck. However, the replacement occurred on a Friday evening, and the cover was missing on Monday morning, apparently discarded by a cleaning crew over the weekend. Plaintiff's husband and a neighbor had taken photographs, however, before the cover was replaced.

II
Plaintiff presented the expert testimony of an architect who reviewed the photographs, specifications and deposition description of the manufacturing process. He explained that since concrete is weak in tensile strength, steel rods are used to reinforce the member. Emphasizing the importance of proper placement of the steel rods, he testified that he found evidence in the photographs of displacement or absence of longitudinal reinforcing rods and of improper alignment of transverse reinforcing rods, as well as evidence that the rods were placed near the top rather than the bottom of the cover.[1] He noted that the latter deficiency results in virtually no tensile strength except the negligible amount attributable to the concrete alone. He also emphasized the importance of aggregate size in achieving proper bonding, and he found evidence in the photographs of oversized aggregate and lack of bonding. From his investigation he attributed the failure of the cover to a deficiency in the manufacturing process.
A civil engineer, expert in reinforcement of concrete, reviewed the same information and opined that a 110-pound woman could cause a fracture by stepping on a cover which had appeared to be in good condition. *253 He stated that the cover was at a point of incipient failure because of the lack of proper design and that the defect would not be obvious to the user of the product.
Both experts also noted the manufacturer's lack of quality control testing procedures and lack of records of the testing that was done.[2]
GS's vice-president, in describing the manufacturing process, discounted the importance of precise placement of reinforcing bars and in fact stated "you could even leave out a couple of them." As to the vibration portion of the process, he conceded that if the product were vibrated more than five to ten seconds, "the gravel would go to the bottom and that would be bad", which contradicted his deposition statement that vibration time was one minute.
GS also presented a consulting civil engineer who classified the cover design as plain (rather than reinforced) concrete, stating that the reinforcing rods were included only to prevent temperature cracking and were not part of the structural design for load bearing efficiency. Defining reinforced concrete as a material in which concrete and steel are designed to function together, he admitted that the product did not conform to the requirements for reinforced concrete. He calculated that the allowable load for the cover as designed was 930 pounds which met the Parish and City code requirements for sidewalks.[3] He opined that the design was not susceptible to incipient failure and that the weight of a person could not collapse the structure unless it had experienced previous failure. In effect, his analysis of the occurrence was that the cover had been previously cracked, probably by being subjected to a load in excess of its ability to carry, and simply gave way when plaintiff walked upon it.[4] He noted from examination of the photographs that "the cracks are of some age", but he did not state the indicia on which he based this conclusion.

III
In answering special interrogatories, the jury found that GS was negligent and LP&L was not.
A manufacturer is liable, without proof of specific fault or of knowledge of the defect, if the injured person proves that he was injured by the product without fault on his own part, that the injury occurred because the product was defective or unreasonably dangerous in normal use, and that the product was defective when it left the hands of the manufacturer. Weber v. Fidelity & Cas. Ins. Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971); Prosser, Law of Torts § 103 (4th ed. 1971). After reviewing the record, we find the evidence supports a conclusion that GS's manufacturing process lacked quality control and that deficiencies in the manufacturing *254 process, more probably than not, caused the product failure and the resulting injuries.

IV
GS's main contention on appeal was that LP&L was concurrently negligent in failing to adequately inspect its facilities. LP&L had no routine procedure for inspecting the covers on a periodic basis. Instead, LP&L relied on its service and maintenance employees to continuously check all equipment in performing their customary duties.
We need not decide in the present case whether this manner of inspection was adequate, since lack of inspections was not a cause-in-fact of this accident. All witnesses testified that the cover contained no cracks prior to the accident. Since only a visual inspection could reasonably be required for a structure with a 20-year expected life, even daily inspections by LP&L would not have prevented this accident. Therefore, conversely, we cannot say that lack of visual inspections caused the accident.
GS next contends that LP&L is liable since the accident occurred on a structure which it owned and maintained. In accident cases involving a hazard which could be caused either by the owner of the utility structure or by a third party, such as an open manhole cover, a public utility is liable upon proof of actual knowledge of the defect or proof that the hazard has existed for a sufficiently long period of time that the public utility should have discovered and corrected it. In cases such as the present one, however, where the hazard is latent and could not reasonably be attributed to the conduct of a third person (or of the plaintiff), a strong inference arises that the defect was due to deficiencies in the manufacture, installation or maintenance of the structure. The evidence in this case shows, however, that the defect occurred more probably than not in the manufacture of the structure and that the accident could not as reasonably be ascribed to any negligence by LP&L in the installation or maintenance of the cover, especially in view of the inspection by the servicemen six weeks before the accident and of the testimony of area residents that they had not observed any cracking prior to the accident.
GS next contends that LP&L's engineers requested the manufacture of this particular item and approved the design. The record shows that LP&L had previously bought smaller vaults (Quickset Electrical Series No. E-22) from GS and requested the larger structures for serving apartment complexes with underground wiring. Quickset furnished GS with the specifications for the larger vaults (Electrical Series No. E-30) and in November, 1969 specifically transmitted a drawing of "Reinforcing for E-30 Meter Box and Cover". LP & L's "approval" of these specifications (by making its own drawing in January, 1970 for its standards committee) cannot reasonably be considered more than an indication the vault fulfilled the company's need, and certainly cannot serve to relieve the manufacturer of responsibility for design or manufacturing defects.
Finally, GS contends the trial judge erred with respect to certain jury charges and evidentiary rulings.
A jury charge outlining the high degree of care required of electric companies is not pertinent to this case, since electricity was not involved in the injury.
The trial judge charged the jury as to circumstantial evidence giving rise to presumptions of negligence on the part of either or both defendants. Nevertheless, the judge emphasized that the burden of proof is on the plaintiff and must be satisfied by a preponderance of the evidence. We find the charge was not prejudicial, especially to the demand for contribution.
*255 A jury charge regarding the duty of a storekeeper to an invitee was properly refused.[5]
We find no error in the giving of LP&L's instruction as to contractual indemnity or in the refusing of GS's instruction on that point. Furthermore, this charge was specifically directed to LP&L's claim against GS, which became moot when the jury in answering the first special interrogatory found that LP&L was not negligent.
GS's offer in evidence of a letter from LP&L's division manager to the corporation secretary was properly excluded as not constituting the best evidence. The proper use of the letter, referring to statements by an LP&L employee who had testified at trial several days before the offer of the letter, was to impeach any earlier contradictory testimony, which the employee would then have had an opportunity to explain. Furthermore, part of the statement constituted an opinion of a non-expert.
The trial judge also properly refused to allow GS, at the conclusion of trial testimony, to read to the jury its requests for admission of facts and LP&L's responses. The purpose of such requests is to eliminate the necessity of proving uncontroverted facts. Voisin v. Luke, 249 La. 796, 191 So.2d 503 (1966). LP&L responded to each request with a denial "as written". When such requests are denied and the requesting party proves the truth of the facts at trial, C.C.P. art. 1514 provides a penalty under certain circumstances. Denials of such requests, however, have no independent probative value and may not be used to show that a party's position on the facts was "less than truthful".
In summary GS is essentially complaining that the jury, when instructed on manufacturer's liability without instructions on the liability of a public utility for the hazardous condition of its facilities and for failure to inspect, could only return an adverse verdict. Viewed in proper perspective, this is essentially a complaint about the strict liability imposed on manufacturers. While the rule is harsh, liability is not imposed unless the evidence preponderates that the injury was caused by a defect which made the product unreasonably dangerous and that the defect existed when the product left the hands of the manufacturer. The latter proof, available only through circumstantial evidence, is the big stumbling block in most product liability cases. See Case v. Metairie Ford, 272 So.2d 49 (La.App. 4th Cir. 1973). The requirement of this proof also answers GS's argument that the manufacturer has no duty to inspect after the sale and cannot know of defects arising thereafter.
We have thoroughly reviewed the voluminous evidence and conclude that the jury's verdict is supported by the record.
The judgment is affirmed.
NOTES
[1] The expert explained that ties or wire mesh are used to prevent horizontal movement and "chairs" or wire clips are used to prevent vertical movement. GS used none of these devices.
[2] GS did not take cylinder samples from each batch and thus could not perform the usual slumping and compression tests on samples. Instead, GS tested the covers themselves, as finished products after curing, by selecting 10 to 15 at random every two or three weeks and performing load tests with a pickup truck. All experts agreed that this testing, although primitive, was practical, if the testing was done regularly and if the samples were representative. One difficulty, however, was that GS delivered some covers, during times of high demand, before the structures had cured for seven days (standard curing time was 28 days) and covers from these batches were apparently never tested.
[3] Plaintiffs' expert, in opining that the cover did not comply with the code of the American Concrete Institute for reinforced concrete (which are incorporated in the City and Parish building codes), noted the difference between a sidewalk, which is poured directly on the earth, and this cover, which must bridge the span between the walls of the vault.
[4] All witnesses denied that any traffic or other heavy objects had crossed the sidewalk. The vault in question was located in a portion of the sidewalk which did not serve as part of a driveway.
[5] In this respect GS complains that the jury erred in not finding LP&L liable for failing to provide routine inspection of facilities, an argument discussed earlier. GS was perhaps entitled to (but did not request) an instruction explaining the liability of a public utility for the hazardous condition of its facilities, but in no event was GS entitled to an instruction on the liability of a storekeeper.