**Mark Richard WALKER, Plaintiff,**

v.

**PREFORMED LINE PRODUCTS CO.
and Western Electric Co., Inc.,
Defendants.**

**No. CV 82–1815.**

United States District Court,
W.D. Louisiana,
Lafayette-Opelousas Division.

Sept. 13, 1984.

Michael D. Lopresto, New Iberia, La., for plaintiff.

Edward P. Landry, Landry, Watkins & Bonin, New Iberia, La., for intervenor.

Robert E. Couhig, Jr., Michael D. Carbo, Adams & Reese, New Orleans, La., for Preformed Line Products Co.

Joseph Onebane, Gorton T. Whitman, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for Western Elec.

## MEMORANDUM OF DECISION

ZAMPANO, Senior District Judge.

In this action the plaintiff, Mark Walker, seeks to recover damages against Preformed Line Products Company ("Preformed") and Western Electric Company, Inc. ("Western Electric") as a result of the serious injuries he suffered when an aerial support cable broke as he was splicing telephone wireworks during the course of his employment with the South Central Bell Telephone Company ("South Central Bell") on August 28, 1981.

A four-day bench trial was held at which 13 witnesses were heard by way of oral testimony and depositions. Although the defendants deny responsibility for the accident and plaintiff's injuries, the Court is convinced that the plaintiff amply sustained his burden of proof on his negligence and strict liability causes of action against the defendants.

### I. FINDINGS OF FACT

#### A. THE PARTIES

1. The plaintiff, Mark Walker, is a citizen of the State of Louisiana who, on August 28, 1981, had been employed as a lineman for over two years by South Central Bell.

2. The defendant, Preformed, is an Ohio corporation engaged in the design and manufacture of various telephone equipment, including "wraps" known as "B-strand connectors" and "B-strand reducers" which are used to splice aerial strands in cable to which were attached telephone lines or wireworks.

3. The defendant, Western Electric, a New York corporation is a subsidiary of American Telephone and Telegraph Company and a one-half owner of Bell Telephone Laboratories, Inc. ("Bell Laboratories"). For many years prior to 1981, Western

Electric purchased B-strand connectors and B-strand reducers from Preformed and sold the products to South Central Bell.

## B. THE B–STRAND CONNECTORS

4. Two basic operations are involved in the installation of overhead telephone lines. First, a support cable, consisting in part of strong strands of steel wires for self-support, is suspended in the air between poles by a ground crew. Attached to and hanging from the cable are sections of telephone wireworks. After the support cable is in place, a follow-up team of linemen complete the project by splicing the sections of the wireworks hanging from the cable.

In addition to serving as a hanger for the wireworks, the cable provides the aerial support for the ladders and seat slings of the linemen as they move along the cable joining the sections of the wireworks.

Both Preformed and Western Electric had knowledge of the purpose and function of the support cable.

5. In performing the initial phase of the work, the ground crew unrolls the cable from large reels. As the cable is unrolled from the reels, the end points of the strands of the cable are joined by splicing them with "wraps."

6. Support cables are made with four different size strand diameters: ¼ inch, ⁵⁄₁₆ inch, ³⁄₈ inch, and ⁷⁄₁₆ inch.

7. It is common knowledge in the trade that, without proper safeguards, the splicing of strands of unequal diameters may be a source of danger to linemen. Thus, in the ordinary course of splicing procedures, only a ¼ inch (6.6M) strand should be joined to another ¼ inch strand, only a ⁵⁄₁₆ inch (6M) strand should be spliced to another ⁵⁄₁₆ inch strand, and so forth.

8. The joinder of identical strands within the cable is accomplished by applying a wrap known as a B-strand connector to the ends of the strands. Because the differences in the diameters of the strands are almost imperceptible to the naked eye, a standard "color coding" marking system was developed to identify the proper con-

nector to be applied to the strands contained within the different cables used in the business. The color yellow on the connector indicated a wrap for a cable with ¼ inch strands, the color black denoted a wrap for a cable with ⁵⁄₁₆ inch strands, the color orange designated a wrap for a cable with a ³⁄₈ inch strands, and the color green designated a wrap for a cable with ⁷⁄₁₆ inch strands.

9. For almost 30 years prior to 1981, Preformed manufactured and sold B-strand connectors to Bell Laboratories and, commencing in the early 1970's, to Western Electric.

10. Preformed produced connectors to accommodate the four sizes of strand diameters in the different cables: ¼ inch, ⁵⁄₁₆ inch, ³⁄₈ inch, and ⁷⁄₁₆ inch. Because of the known danger involved in splicing strands of dissimilar diameters, Preformed utilized two methods to identify and alert the ultimate user to the different sizes of connectors.

11. First, Preformed marked the different connectors, approximately at midpoint, with a single, small slash or dot of paint according to the color coding scheme known through the industry: a splash of yellow for the ¼ inch connector, a splash of black for the ⁵⁄₁₆ inch connector, a splash of orange for the ³⁄₈ inch connector, and a splash of green for the ⁷⁄₁₆ inch connector.

12. Second, Preformed's design specifications called for a water proof tag, setting forth a description of the connector and its size, to be securely attached to each connector.

## C. THE B–STRAND REDUCER

13. In 1966, it became evident to Preformed that the evolving needs of the telephone industry required a wrap that was capable of joining cables containing strands of dissimilar diameters.

14. In response to the demand, Preformed designed, patented, and manufactured a new wrap, known as a B-strand reducer.

15. The reducers were produced in three sizes to accommodate joinder of a $5/16$ inch strand to a $1/4$ inch strand, a $3/8$ inch strand to a $5/16$ inch strand, and a $7/16$ inch strand to a $3/8$ inch strand.

16. Preformed and Western Electric knew that the reducer was not designed to, nor could it safely be used to, connect cables containing strands of identical diameters.

17. To the naked eye, in the absence of suitable identification markings, the reducer wrap was identical in appearance to the connector wrap. Both wraps were applied by the user in the same way.

18. The record amply discloses that Preformed and Western Electric, in the early stages of production and sale of the reducer, were warned of and were well aware of the probability that a lineman could easily confuse the two wraps, and therefore apply a reducer wrap instead of a connector wrap unless proper and adequate markings clearly distinguished the two different products. Both companies knew that such a misapplication to a support cable created a risk of injury to a lineman in a sling seat splicing wireworks.

19. On November 9, 1966, prior to any sales of the reducer, Mr. Jack Snyder, a sales representative for Preformed in New York, informed Preformed that: "[a]ll have said if you come out with a reducer that looks like a splice you should splash it up with plenty of color marks so that it couldn't possibly be mistaken for our regular splices."

20. In a reply on November 16, 1966, Mr. William Hershey, the assistant manager of telephone products sales at Preformed, wrote:

Just for my information, will you find out what color they would want on the $1/4''$ side. We not only have the problem of perhaps using the splice on the wrong size strand, but also we have to make sure that the lineman puts the $1/4''$ side on the $1/4''$ strand, etc. See if some of your smarter customers can come up with a way to make this foolproof.

21. As requested, Mr. Snyder made the following recommendations to Preformed officials on November 28, 1966:

1. Stick with the two colors you have already established for $5/16''$ (black) and $1/4''$ (yellow).

2. Increase the width of the color splashes on the reducer. One .... it will show up better than on a regular splice and two ..... it will make them different from the splice. [ellipses in original].

3. Color code each side of the reducer in its appropriate color.

4. We assumed the reducer would be subseted and hence two wraps of tape would be needed at each end to hold subsets together. Here again you could use one black and one yellow tape on the proper side with the word "Reducer" imprinted on the tape over and over. If you can't color code these tapes, by all means imprint them with the word "Reducer" over and over.

22. On December 12, 1966, Mr. Fred J. Lekson, a Preformed employee demonstrating the new reducer to customers in the field, wrote to his brother, Mr. Max Lekson, Preformed's manager of sales, that the $1/4$ inch side of the reducer should be color coded yellow and the $5/16$ inch side of the reducer should be color coded black. To explain his recommendation he submitted the following sketch:

1/4" 5/16"

Yellow Color Code

offset of splice

Cups Welded

Black Color Code

23. On December 28, 1966, Mr. Jack Scanlon, another Preformed sales representative demonstrating the new reducer wrap to customers in the field, notified Preformed officials that the demonstrations revealed "a great lack of knowledge on the proper application, not only in the guide grip, but also the splice."

24. A few months later, on March 22, 1967, Mr. T.J. Finn, a test engineer at Preformed, informed Mr. Max Lekson that it was "required" that the reducer have "a definite size identification on each end."

25. As a result of these communications, Mr. Max Lekson became increasingly concerned over the need for an adequate color coding design for the reducer as a safety measure for linemen. He discussed a multi-color design for the reducer with Mr. P.G. Clark, an engineer with Bell Telephone Laboratories. Mr. Lekson testified that Mr. Clark rejected multiple colors on the reducer because he didn't want the product to look like a "barber's pole." (Mr. Clark died prior to 1981).

26. Preformed decided not to market its 5/16 inch to 1/4 inch reducer with the identification markings recommended by its sales representatives and test engineer. Rather, it sold the reducer with single color identification marks: a dot of yellow was painted on the mid-point of the reducer with three small splashes of yellow painted along the smaller side of the strand.

27. In addition, because it recognized that the color marks on the reducer may not be sufficient for a lineman to distinguish the reducer from a connector, Preformed decided to add an identification tag on the reducer. Specifications required that the tag be durable and be attached to the reducer so as to withstand "shipping and handling."

28. In the late 1960's, Western Electric, acting as the purchasing arm of Bell Laboratories, made an independent examination of the reducer and concluded that, except for some minor changes, it was functionally suitable. It further determined, after independent review, that Preformed's methodology of color coding and tagging the reducer was adequate for safety purposes.

29. However, the tags placed on the reducers by Preformed did not conform to specifications in that they became easily detached from the reducers, did not withstand shipping and handling, and generally were missing by the time the reducers were used in the field by linemen.

30. Prior to 1981, despite periodic inspections of the reducers, Western Electric's experts failed to detect Preformed's breach of the specifications pertaining to the tags.

31. After independent review of all aspects of the design and composition of the reducer, Western Electric became the ma-

jor purchaser of the reducers. Its orders included specifications which essentially adopted Preformed's design and marketing characteristics, including color coding and tagging.

32. Western Electric, in turn, resold the reducers to individual operating companies, including South Central Bell. The reducers were shipped in boxes containing 50 subsets. A document entitled "Application Procedure and Safety Considerations, Preformed Line Products" ("Application Sheet"), enclosed in the box did not set forth the exact color coding identification scheme for the reducers.

33. In the mid-1970's and continuing through the year 1980, Preformed attempted to convince officials at Western Electric to accept additional color coding on the reducer "[t]o provide an added measure of safety ...." (Gemra deposition p. 40). Western Electric consistently rejected the recommendation. Preformed, in order not to jeopardize its huge sales of reducers to Western Electric, did not make any changes to the color coding scheme on the reducer until 1982. In that year, Mr. Richard Gemra, the newly appointed Development Engineer at Western Electric, approved the additional color markings.[1]

34. Mr. George Hollon, plaintiff's expert, testified that: 1) tests revealed that a ¼ inch strand wrapped with a ⁵⁄₁₆ inch to ¼ inch reducer initially held under tension and with a person's weight on it, but broke within a short time thereafter; and 2) safe and proper practice required that in order to avoid misapplication by a lineman,

the reducer should have been color coded with yellow-black markings with a durable identification attached to it.

## D. THE PLAINTIFF'S ACCIDENT

35. On August 27, 1981, a team of South Central Bell linemen was on assignment to hang five miles of telephone line in Jeanerette, Louisiana. The ground crew consisted of Clint Lambert, Jeff Miller, and Brett McDonald. The plaintiff was not a member of the ground crew. Lambert and Miller had had two years of experience with South Central Bell; McDonald had been with the company for only six months.

36. As the work of the ground crew progressed, it became necessary for the crew to splice two cables with ¼ inch strands. Lambert asked McDonald to get him a "wrap" from the truck. McDonald asked what size was needed, to which Lambert replied "6.6" (¼ inch). McDonald then inquired, "[H]ow can I tell?" Lambert stated, "[C]heck the tags." After searching through the truck, McDonald reported to Lambert that none of the wraps had tags on them. Lambert then instructed McDonald to get "one marked with yellow." McDonald did so, and Lambert applied the wrap to the strand ends of the cables. The joined cables formed the support cable which was then pulled taut and suspended in the air.

37. The following day the plaintiff, working alone as a follow-up lineman, arrived at the site for the first time to splice the wireworks hanging from the support

---

1. The fact that color code changes were actually made in 1982, a year following plaintiff's accident, has played no part whatsoever in this Court's rulings on liability in this case. *Cook v. McDonough Power Equipment, Inc.*, 720 F.2d 829, 831 (5 Cir.1983). The color code change in that year is only mentioned to establish a point of reference for the occurrence of other events which do have relevance in this lawsuit.

Mr. Gemra's deposition, taken on June 3, 1983, was introduced as an exhibit by Preformed at trial. At the time of his deposition he stated he had been employed at Western Electric for approximately four years, or since 1979. He further testified that he had knowledge that Preformed "had been for several years trying to

convince the responsible individuals *prior to my tenure* with the company (Western Electric) to add [an additional set of] markings." (Gemra deposition p. 40) (emphasis added). These discussions continued *after* Mr. Gemra became Development Engineer at Western Electric in 1979, culminating in the change actually being made in 1982.

Therefore, it is logical to infer, as set forth in Finding of Fact number 30, that several years prior to 1979 and continuing thereafter during Mr. Gemra's employment in 1979 and 1980, officials of both defendants had discussions concerning the need for additional color coding on the reducer for safety reasons, but failed to take action to effect a change.

cable. He carefully checked the integrity of the cable by throwing a rope over the cable at mid-span and pulling on the rope with full weight. The cable held firmly. He then climbed a ladder approximately 18 feet, attached his seat sling to the cable, and commenced splicing the wireworks attached to the cable.

38. During the course of the splicing procedures, the strands of the cable, which had been erected by the ground crew the previous day, broke apart. The plaintiff fell to the ground, sustaining rather serious injuries.

39. It is uncontroverted that the reason the strands of the cable parted was that a reducer wrap, rather than a connector wrap, was employed to connect the ¼ inch strands contained in the cables that were joined by the ground crew the day before. The reducer wrap was ¼ inch on one end, 5/16 inch on the other.

40. The evidence disclosed that, at the time of the accident, both Lambert and McDonald were familiar with the standard color coding scheme used to identify the various sizes of connectors. However, neither had knowingly applied a reducer previously nor had knowledge of the special color coding identification marks utilized by Preformed on its reducer.

41. It is also noteworthy that John Viator, a supervisor of linemen with over 30 years experience at South Central Bell and the investigator assigned to determine the cause of plaintiff's accident, testified that prior to plaintiff's accident he did not have a ready familiarity with the special color coding marking which distinguished a reducer from the color coding on the commonly used connector.

42. McDonald would not have selected a reducer instead of a connector if the reducer had yellow-black color coding.

43. McDonald would not have selected a reducer instead of a connector if the reducer had an identification tag on it.

44. Lambert would not have applied the reducer to the strands if the reducer had yellow-black color coding.

45. Lambert would not have applied the reducer to the strands if the reducer had an identification tag on it.

46. Plaintiff's accident and injuries would not have occurred if the reducer had been properly color coded and tagged.

### E. PLAINTIFF'S INJURIES AND LOSSES

47. The extent of plaintiff's injuries was not seriously contested at trial. He sustained a concussion, a severely cracked wrist, numbness in five digits of his right hand, damage to the median and ulnar nerves in the right hand, cartilage damage to his right knee, and various abrasions to his body.

48. The plaintiff has had a long and arduous road to recovery. He has been hospitalized on four occasions for surgical procedures to his wrist and knee. Among other treatments he has incurred are: a closed reduction and placement of a fixation device to hold the reduction in place on his wrist, a wrist cast for several months, a lateral meniskectomy to repair a tear of the lateral meniscus of the right knee, osteotomy to shorten the ulna bone in his right wrist in order to realign the joint in a more normal fashion, the placement of a steel plate into the arm, and a bone graft. In addition, credible medical testimony indicates further surgery on his wrist will be required.

49. Permanent injuries include numbness, lack of full motion, pain and swelling of the right wrist, and some disability of the knee. Assigned disability percentages are as follows: 20 percent impairment of the upper extremity and 15 percent impairment of the lower extremity.

50. Medical expenses to date are $19,-575.69, with anticipated medical costs in the future of over $3,000.00. Lost wages are $15,894.09 with anticipated future lost wages of $3,150.00.

51. Intervenor South Central Bell claims reimbursement for medical and compensation payments in the sum of $25,-112.49.

## II. CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

2. The plaintiff sustained his burden of proof on all essential elements of his cause of action in strict liability against Preformed.

3. The plaintiff sustained his burden of proof on all essential elements of his causes of action in negligence against Preformed and Western Electric.

4. Plaintiff was free from contributory negligence and "fault."

5. Neither South Central Bell nor plaintiff's coworkers acted unreasonably under the circumstances.

6. Any acts or omissions of South Central Bell and plaintiff's coworkers did not constitute intervening causes which insulate Preformed and Western Electric from liability.

7. All contested issues of fact and law are resolved in plaintiff's favor and against the defendants.

8. Judgment may enter in behalf of the plaintiff and against the defendants.

9. The intervenor is entitled to reimbursement.

## III. DISCUSSION

Plaintiff grounds his action against the defendants on two distinct theories of liability: strict liability and negligence.

## A. THE CASE AGAINST PREFORMED

In the landmark case of *Weber v. Fidelity & Casualty Insurance Co. of N.Y.*, 259 La. 599, 250 So.2d 754, 755–56 (1971), the doctrine of strict liability in tort under Louisiana law was established as follows:

> A manufacturer of a product which involves a risk of injury to the user is liable to any person ... who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect.
>
> If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them.

Under the foregoing principles, the four elements necessary to support the imposition of strict liability are: a product unreasonably dangerous to normal use, a product in normal use at the time of injury, an injury caused by the defective product and the reasonable forseeability of such an injury. *Pawlak v. Brown*, 430 So.2d 1346, 1351 (La.App.), *writ denied*, 439 So.2d 1072 (La.1983); *Byrd v. Hunt Tool Shipyards, Inc.*, 650 F.2d 44, 47 (5 Cir.1981).

The Louisiana law of negligence in products liability cases is conventional: the plaintiff must prove that the product created an unreasonable risk of injury, that the defendant knew or should have known of the risk, that the defendant failed to prevent or adequately warn of the risk, and that the product was a proximate cause of the plaintiff's injuries. *Kent v. Gulf States Utilities Co.*, 418 So.2d 493, 497 (La.1982). Thus, the concepts of strict liability and negligence in Louisiana are substantially the same, except that the defendant's lack of actual or constructive knowledge of the risk involved is not a defense to a claim of strict liability, but does preclude a recovery in negligence. *Bridges v. Chemrex Specialty Coatings, Inc.*, 704 F.2d 175, 178 (5 Cir.1983); *Madden v. Louisiana Power and Light Co.*, 334 So.2d 249, 253 (La.App.1976).

The Court, applying these principles of law to the facts fully supported by evidence at trial, has little difficulty in concluding the plaintiff sustained his burden of proof against Preformed on both causes of action.

## UNREASONABLY DANGEROUS PRODUCT

The evidence established that for many years prior to 1966 Preformed designed, manufactured and sold a "B-strand connector," a splicing wrap used by telephone linemen to connect aerial strands of cable. The connector was intended only to join strands of the same diameter. It was common knowledge at Preformed that utilizing a connector to splice strands of cable with dissimilar diameters was dangerous and created a risk of injury to the user. Because differences in strand diameters were almost imperceptible by eye, Preformed, quite sensibly, placed markings on its connectors in conformity with the distinct color coding standards known to and easily recognizable by those employed in the trade: yellow for the 1/4 inch connector, black for the 5/16 inch connector, orange for the 3/8 inch connector, and green for the 7/16 inch connector.

In 1966, in order to meet the demands of the marketplace, Preformed designed and patented a "B-strand reducer" which could safely connect strands of cable with disparate diameters. At the time of design and manufacture, Preformed knew that its new reducer, identical in appearance to its connector, could not be used safely by linemen to splice strands of cable with similar diameters. Thus, it was recognized at Preformed that a lineman, splicing wireworks in a sling seat supported in the air by a cable, would be exposed to injury if a reducer, rather than a connector, had been accidentally employed by the ground crew to join one of the support cables with 1/4 inch strands to another of the support cables containing 1/4 inch strands.

With this known risk to linemen in mind, Preformed's sales representatives, who were demonstrating the product to customers in the field in 1966, urged that the new reducer bear color-coded markings which would clearly distinguish it from the connector. Mr. William Hersey, an official at Preformed in November 1966, recognized the need for a "foolproof" color coding system "to make sure that the lineman puts the 1/4" side on the 1/4" strand, etc." Preformed's test engineer reported that "size identification" markings on both ends of the reducer were "required." In particular, because the industry already had established color markings for the various strand diameters in cable, recommendations were made that the 1/4 inch side of the reducer be color coded in yellow and the 5/16 inch side of the reducer be color coded in black. The cost for this color coding system was minimal.

It seems obvious to the Court that the color coding recommended by Preformed's own employees, representatives and engineers, if adopted, would have clearly enabled a lineman, with even a modicum of experience, to differentiate a reducer from a connector and, in all probability, would have prevented the injury to the plaintiff in this case. The Court is fortified in its conclusion after an inspection of the reducer wrap at trial, and by the credible testimony of Mr. George Hollon, an expert called by the plaintiff.

Unfortunately, Preformed decided not to market its reducer with different colors to identify dissimilar strand ends of wrap, such as a black-yellow color coding for the 5/16 inch to 1/4 inch reducer. Rather, it manufactured and sold the reducer employing only one color. On the 5/16 inch to 1/4 inch wrap, a dot of yellow was placed on the middle of the reducer with three slashes of yellow painted along the smaller side of the strand to be joined. In addition, a small identification tag was attached to the reducer.

In the Court's opinion, Preformed's deliberate decision to reject the recommendations of its own agents and experts concerning the proper color coding for the reducer evinced a gross and callous disregard for the safety of ultimate users. Even in the absence of expert advice, plain common sense should have dictated to Preformed that there was a likelihood a lineman in the workplace might confuse the yellow slash marks on the reducer for the yellow slash mark on the connector and, as

a consequence, a dangerous misapplication would result.

The evidence revealed that proper color coding was the most effective economical method to identify the various diameter sizes of strands and wires for lineman. However, identification tags attached to the products might be considered a reasonable alternative, particularly for an inexperienced lineman on the job. In the instant case, it was virtually uncontroverted that the tags placed on the reducers by Preformed prior to plaintiff's accident did not conform to specifications, and became detached from the wraps by the time they were used by linemen. None of the wraps stored in South Central Bell's supply truck from which McDonald obtained the wrap in question for Lambert had identification tags.

Under these circumstances, the Court concludes that: 1) the reducer, as placed into commerce by Preformed without appropriate color coding and without adequate tags, was an unreasonably dangerous product in design, composition and identification, and 2) Preformed's conduct, in marketing the reducer as it did, constituted a lack of due care and a breach of duty owed to an ultimate user of its product. *See Pawlak*, 430 So.2d at 1349–50; *Avery v. Maremont Corp.*, 628 F.2d 441, 447 (5 Cir.1980); *Chappuis v. Sears, Roebuck & Co.*, 358 So.2d 926, 930 (La.1978); *Ducote v. Chevron Chemical Co.*, 227 So.2d 601, 604 (La.App.1969).

NORMAL USE

Although it is true, as Preformed contends, that McDonald's and Lambert's use of a reducer to splice similar strands in the support cable was improper, it does not follow that the reducer was not in "normal use" at the time.

■ "Normal use" under Louisiana law "encompasses all *reasonably foreseeable* uses of a product." *LeBouef v. Goodyear Tire & Rubber Co.*, 623 F.2d 985, 989 (5 Cir.1980) (emphasis in original). An unintended use as well as a use for which the product was not designed may be considered a "normal use," if the product was employed in a manner and for a purpose reasonably to be foreseen by the manufacturer. *Cobb v. Insured Lloyds*, 387 So.2d 13, 18 (La.App.), *writ denied*, 394 So.2d 615 (La.1980); *Bradco Oil & Gas Co. v. Youngstown Sheet & Tube Co.*, 532 F.2d 501, 503–04 (5 Cir.1976), *cert. denied*, 429 U.S. 1095, 97 S.Ct. 1111, 51 L.Ed.2d 542 (1977); *Amco Underwriters of the Audubon Ins. Co. v. American Radiator & Standard Corp.*, 329 So.2d 501, 504 (La. App.1976).

■ Here, the exact risk, anticipated and sought to be avoided at the time of the reducer's design and manufacture, was that a lineman might utilize a reducer in situations that required a connector, and vice versa. A misapplication in use was not only foreseeable but, without adequate safeguards, was actually expected by Preformed's agents and experts. Therefore, the Court finds that the inadvertent use of the reducer by the ground crew to connect the plaintiff's support cable, though improper, was within a "normal use" of the product. *Woods v. International Harvester Co.*, 697 F.2d 635, 637–39 (5 Cir.1983); *Branch v. Chevron International Oil Co., Inc.*, 681 F.2d 426, 429 (5 Cir.1982); *Foster v. Ford Motor Co.*, 616 F.2d 1304, 1310–11 (5 Cir.1980); *Pawlak*, 430 So.2d at 1350; *Cobb*, 387 So.2d at 18.

CAUSATION

At pretrial, the parties stipulated that the cable, supporting the plaintiff in the air while he was splicing wireworks, broke because the reducer ceased to hold the strands at the place of splice. As a result, the plaintiff fell to the ground and sustained injuries.

FORESEEABILITY OF INJURY

It was not disputed that a lineman, splicing wireworks attached to an aerial cable, would also depend on that cable to provide support for his ladder and sling seat. It was common knowledge at Preformed that a defective or misapplied wrap eventually would fail to hold the strands in the cable at the place of splice, and that such a

situation presented a hazard and risk of injury to a lineman. The type of accident that occurred in this case was readily apparent to and feared by Preformed's agents and experts at the time of the design, manufacture, and marketing of the reducer. *Hall v. Chrysler Corp.*, 526 F.2d 350, 352 (5 Cir.1976).

PREFORMED'S DEFENSES

 Preformed claims that it manufactured the reducer according to specifications submitted by Western Electric, a sophisticated buyer, and that Western Electric, and not Preformed, must accept full responsibility for any defect in the design or composition of the reducer. Under Louisiana law, a manufacturer's liability may be precluded in instances where a sophisticated purchaser designed and requested a product for a particular application. *Byrd,* 650 F.2d at 47 n. 1. However, Preformed, and not Western Electric, was the designer, manufacturer and patent holder of the reducer. Western Electric merely "approved" Preformed's work by submitting its own drawings of Preformed's standards, with only minor changes not relevant to this action. Under these circumstances, the Western Electric specifications were nothing more than an indication the reducer "fulfilled the company's need, and certainly cannot serve to relieve the manufacturer of responsibility for design or manufacturing defects." *Madden,* 334 So.2d at 254.

Even assuming *arguendo* that the final decision with respect to color coding the reducer rested with Western Electric, Preformed had an independent duty to remedy the misleading and confusing color coding placed on the reducer which created a trap for linemen. *Byrd,* 650 F.2d at 48; *Crane v. Sears, Roebuck & Co.,* 218 Cal.App.2d 855, 32 Cal.Rptr. 754, 756 (1963). Moreover, it was not disputed that Preformed had the further duty to attach the tags securely to the reducers to aid linemen to identify the product. Its breaches of these duties also constitute negligence.

Preformed further asserts that it "assumed" and "expected" that Western Electric, in distributing the reducer, would provide adequate safeguards for the use of the product. But there is no evidence that Preformed investigated or was informed that Western Electric had taken any steps to color code or tag the reducer properly so as to avoid misapplication by the user. It seems clear that Preformed, in order to protect the ultimate user, had an independent duty either to remedy the obvious defect itself or to ensure that Western Electric took appropriate remedial action before reselling the reducer. *Hall,* 526 F.2d at 352; *Suchomajcz v. Hummel Chemical Co.,* 524 F.2d 19, 27 (3 Cir.1975); *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1091 (5 Cir.1973); *Crane,* 32 Cal.Rptr. at 756. Preformed is not being charged for the tort of Western Electric; it is liable for failing to protect against the risk of injury inherent in foreseeable uses of the reducer. Its duty of due care extended not only to a purchaser in the distributive chain of the product but also to the ultimate user of the product. *Byrd,* 650 F.2d at 48.

Preformed next contends that, because yellow-black color coding on the reducer could be considered aesthetically offensive, it acted reasonably in rejecting the markings in order to preserve its business relationship with Western Electric. The Court has great difficulty in believing that the ludicrous "barber pole" comment by a now-deceased official at Western Electric was taken seriously by officials at Preformed. The questions come to mind: to whom would a few paint marks on reducers less than one-half inch in diameter and 20 feet above the ground be offensive? Vehicular traffic? Pedestrians looking skyward? A few birds?

 Even assuming one could somehow be justified in concluding that Western Electric would cancel all orders for the much-needed, patented reducer because it lacked fashion in makeup, there were feasible alternatives available to protect linemen from the dangers of the reducer as marketed. Preformed could have tagged the product securely to avoid detachment prior

to use, as required by specifications. Also, the reducer could have been packaged individually, at a modest cost, with identification information on the wrapping. Or, as one of Preformed's agents recommended, the product itself could be imprinted with "reducer" in one color. In any event, if the duty of due care requires certain action, the failure to perform that action is not excusable on the ground of its possible adverse effect upon the manufacturer's business. *Brizendine v. Visador Co.,* 437 F.2d 822, 828 (9 Cir.1970).

Preformed's claims of contributory negligence and "fault" on the part of the plaintiff lack factual support in the record. The standards for determining and the effect of a finding of "victim fault" and "contributory negligence" in strict liability and negligence cases under Louisiana law are comprehensively discussed in *Hyde v. Chevron U.S.A., Inc.,* 697 F.2d 614, 622–30 (5 Cir.1983). The plaintiff neither knew nor had reason to suspect that the support cable had been secured by a reducer rather than a connector. Moreover, once the strands were wrapped, the misapplication was not apparent. Pursuant to the usual and customary procedures, the plaintiff tested the cable's integrity before using it for support. As explained by the plaintiff and by his expert at trial, the spliced strands were initially strong enough to hold against plaintiff's weight, but, with the pressure of his sustained weight as he moved along the cable connecting the wireworks, the strands gradually parted and then broke. The Court finds that the plaintiff took all reasonable precautions for his safety prior to the accident. *Pawlak,* 430 So.2d at 1352; *LeBouef,* 623 F.2d at 991; *Chappuis,* 358 So.2d at 930; *Hall,* 526 F.2d at 352.

The Court further rejects the arguments advanced that the acts or omissions of the ground crew in applying the wrong wrap, and/or of South Central Bell in allegedly failing to train the ground crew properly, constitute intervening causes which absolve Preformed. At the time of application, Lambert correctly instructed Mc-

Donald to identify the needed wrap by means of the tag. Had the identification tag been attached to the product, as it should have been, McDonald would not have selected a reducer instead of a connector. When the absence of the tag was reported to Lambert, he quite understandably advised McDonald to obtain the wrap which conformed to the standard color coding known to both men: yellow for a ¼ inch connector. Had the wrap been color coded with black and yellow, McDonald would not have chosen the reducer and, even if he did, Lambert would have quickly recognized the error and would not have applied it to the strands. Due to the general unawareness among linemen, experienced as well as inexperienced, that under Preformed's special color coding system three yellow dots were a substitute for the "black" markings commonly associated with "⁵⁄₁₆ inch," the Court is satisfied that neither Lambert nor McDonald acted unreasonably under the circumstances.

Pointing to the information set forth in its catalog and "Application Sheet" furnished at the time of sale and distribution of the reducer, Preformed contends that linemen should have been instructed on the reducer's color coding system by their employer, South Central Bell. It argues that had South Central Bell adequately trained the ground crew, the accident would not have occurred. However, the evidence established: 1) that neither Preformed's catalog nor "Application Sheet" contained sufficient explanations concerning the slight differences between the color coding on the reducer and the connector; and 2) that, in the light of the persistent recommendations made to Preformed over the years to change the reducer's color coding system for safety reasons, Preformed knew or should have known that the reducer's special markings were not effectively or understandingly being communicated by the employer to linemen in the field. The Court finds that Preformed lacked a reasonable basis for its "assumption" and "expectation" that linemen, through school and "on the job" training, would have a realistic working familiarity with the reduc-

er's unique color coding to be alert to and to avoid inadvertent misapplication. *See Gordon v. Niagara Machine & Tool Works,* 574 F.2d 1182, 1186–90 (5 Cir.1978); *Dulin v. Circle F Industries, Inc.,* 558 F.2d 456, 467–68 (8 Cir.1977); *see also Melancon v. Western Auto Supply Co.,* 628 F.2d 395, 399 (5 Cir.1980).

■ In any event, even assuming subsequent causative acts by plaintiff's employers and coworkers, the conduct complained of does not relieve Preformed of responsibility. It is settled law that the intervention of an independent, intervening cause does not insulate the original tortfeasor from liability if that intervention was probable or foreseeable. In other words, a negligent act continues to be a proximate, concurring cause of injury if the intervening act was a reasonably foreseeable result of the original negligence. *Gordon,* 574 F.2d at 1191–95; *Moyer v. Martin Marietta Corp.,* 481 F.2d 585, 591–94 (5 Cir.1973); *see also Abdallah v. Caribbean Security Agency,* 557 F.2d 61, 63 and cases cited at n. 3 (3 Cir.1977); *Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge,* 424 F.2d 684, 689 (5 Cir.), *cert. denied,* 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970); *Travelers Insurance Co. v. Brown,* 338 F.2d 229, 239–40 (5 Cir.1964).

In this case, for reasons set forth at length above, the Court is convinced that the intervening acts were not only foreseeable consequences of a situation created by the design, composition and marketing features of the reducer, but also were actually expected by Preformed's agents and experts. Therefore, Preformed's acts and omissions are found to be a direct and proximate cause of plaintiff's accident and injuries.

## B. THE CASE AGAINST WESTERN ELECTRIC

■ A nonmanufacturer seller of a defective product is liable in tort under Louisiana law only if it knew or should have known that the product sold was defective. *See, e.g., Winans v. Rockwell International Corp.,* 705 F.2d 1449, 1453 & n. 7 (5 Cir.1983); *Reeves v. Great Atlantic & Pacific Tea Co.,* 370 So.2d 202, 209 (La.App.), *writ denied,* 371 So.2d 835 (La.1979); *Spillers v. Montgomery Ward & Co.,* 294 So.2d 803, 807 (La.1974).

■ In this case, Western Electric acted in concert with Preformed in almost all aspects of the reducer's marketing features. Its highly skilled and knowledgeable technicians examined and approved the design and identification of the product. It expressly ratified the defective color coding system placed on the reducer by Preformed. By incorporating the reducer's color coding system into its own purchase order specifications, Western Electric effectively adopted the overall composition of the reducer, which it then sold to South Central Bell. At all relevant times herein, it had full knowledge of the inherent danger a misapplication of the reducer posed to South Central Bell's linemen whose safety depended on the integrity of aerial support cables. Its stubborn and unjustifiable refusal for years, despite the entreaties of agents and experts at Preformed, to authorize a modification of the color scheme on the reducer strains credence. In the light of the uncontroverted testimony on the matter, the Court is compelled to conclude that Western Electric's conduct demonstrated a blatant insensitivity to the reducer's known risk of injury to linemen.

Moreover, Western Electric further breached its duty of due care owed to South Central Bell and its linemen when it did not detect and withhold from distribution all reducers not tagged in accordance with specifications. Western Electric officials acknowledged that the company had an independent, nondelegable duty to examine the reducer's marketing features to ensure contract performance by Preformed. The failure to control the quality of the identification tags on the reducer placed a product into the stream of commerce that was reasonably foreseeable to be a danger to the ultimate user. *Benoit v. Ryan Chevrolet,* 428 So.2d 489, 493 (La.App.1983); *Gordon,* 574 F.2d at 1185;

*Amco Underwriters,* 329 So.2d at 503; *see also Chappuis,* 358 So.2d at 930 (strict liability).

To the extent that Western Electric tracks Preformed's contentions with respect to causation and contributory negligence, the Court, for the reasons stated previously, resolves all issues raised in favor of the plaintiff.

■ The only defense advanced by Western Electric that merits additional comment pertains to the claim that it "expected" South Central Bell to train linemen concerning the proper use of a reducer. The short answer to this contention is that officials at Western Electric were informed by Preformed for several years prior to plaintiff's accident that an alteration in the color coding system on the reducer was required "for safety reasons." The reducer was used only by linemen. Therefore, it is inferable that Western Electric over a long period of time knew or should have known that linemen were not receiving adequate instructions concerning the application of the reducer in the field. Under these circumstances, Western Electric lacked a reasonable basis for its "assumption" that South Central Bell was conveying sufficient information to its linemen to avoid an inadvertent application of a reducer instead of a connector. *See Gordon,* 574 F.2d at 1188–89.

In any event, as in the case against Preformed, the evidence disclosed that the plaintiff's accident was precisely the type that was readily foreseeable by Western Electric in the event of a misapplication of a reducer. It had the knowledge, authority, and opportunity to remedy the risk of injury posed by the reducer to a lineman such as plaintiff, but failed to do so. The intervening acts or omissions of South Central Bell and plaintiff's coworkers did not break the chain of causation established by Western Electric's negligence and, therefore, cannot serve to relieve Western Electric of liability. *See, e.g., Gordon,* 574 F.2d at 1191–95; *Moyer,* 481 F.2d at 592–93; *Travelers Insurance Co.,* 338 F.2d at 239–40. The Court finds that Western Electric's negligence was a proximate cause of plaintiff's accident and injuries.

## C. DAMAGES

■ The plaintiff is 28 years old, married, with two children. Prior to the accident, he was a healthy, hard working individual. As a result of the accident, he has incurred four surgeries, permanent impairment of his right leg and right hand, a significant amount of pain and inconvenience, lost wages and medical expenses. In addition, he will have another operation and will suffer future pain and discomfort, lost wages, and medical expenses.

There is no fixed standard by which the exact amount of damages is measured. However, based on the documentary and testimonial medical evidence and this Court's observation of the plaintiff at trial, fair and reasonable compensation in this case is found to be as follows: $19,575.69 for past medical expenses, $3,500.00 for future medical expenses, $15,894.09 for past lost wages, $3,150.00 for future lost wages, $60,000.00 for past pain, suffering, and mental anguish, $20,000.00 for future pain, suffering, and mental anguish, $25,000.00 for loss of function in the wrist, and $12,500.00 for loss of function in the knee.

Accordingly, judgment shall enter against Preformed and Western Electric, *in solido,* in the sum of $159,619.78, plus interest from date of judicial demand, *Byrd,* 650 F.2d at 49, of which plaintiff shall reimburse intervenor in the amount of $25,112.49, plus interest from date of judicial demand.